Travis **ANDERSON, Dec., by His Dependents, Appellant,**

v.

**VERACITY RESEARCH CO., Respondent.**

No. WD 70452.

Missouri Court of Appeals, Western District.

Nov. 10, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 2009.

Application for Transfer Denied Jan. 26, 2010.

Jerrold "Jerry" Kenter, Kansas City, MO, for appellant.

Steven J. Quinn, Kansas City, MO, for respondent.

Before ALOK AHUJA, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

The family of Travis Anderson appeals the judgment of the Labor and Industrial Relations Commission denying compensation under the Workers' Compensation Act. The family argues on appeal that because the employer's answer to the claim was untimely, the employer was precluded from denying that the employee's fatal accident arose out of his employment. The family also contends that the evidence showed that the employee's death occurred in the course of his employment. The judgment is affirmed.

### Facts

Travis Anderson worked for Veracity Research Company ("Veracity"), investigating workers' compensation claimants who were suspected of fraud. Anderson was killed in a one-car accident in Jackson County, Missouri, on July 19, 2003. He

was survived by his wife and two minor children ("Anderson's family").

Anderson's family filed a claim with the Division of Workers' Compensation seeking benefits for Anderson's death. The Division acknowledged receipt of the claim on February 24, 2004. Veracity filed an untimely answer in August 2005.

The claim proceeded to a hearing before an administrative law judge. The parties requested the administrative law judge determine in relevant part: (1) whether Anderson sustained an accident arising out of and in the course of his employment, and (2) the extent to which Veracity may raise defenses, as its answer to the claim for compensation was not timely filed. The following evidence was presented at the hearing.

Anderson's widow testified that her husband worked irregular hours while employed by Veracity. When he was working in their home town, he would normally arrive home between 5:00 p.m. and 6:00 p.m. Anderson often called his wife while out doing surveillance. He never called after 5:00 p.m. Anderson would occasionally receive a call from Veracity asking him to go out on business during the evening hours. This happened only a few times, though, and he always took his laptop and camera with him on such occasions. Anderson's widow stated that she had no knowledge regarding her husband's job duties for Veracity and that he was secretive about the details of his job.

At the time of Anderson's fatal accident, the family lived in Wichita, Kansas. His wife was not at home when Anderson left for the Kansas City area. Anderson and his wife last spoke on July 16, 2003, three days before his death, while he was travelling from Wichita to the Kansas City area. He indicated that he was going to be working in Blue Springs or Independence near Kansas City. Anderson's widow knew no details regarding Anderson's work assignment. She did not know if he had plans other than working while in the Kansas City area. She had no personal knowledge of where her husband was going or what he was doing at the time of his death.

The location of the fatal accident was two miles from the hotel in which he was staying in Blue Springs. It was also near the residential street of the subject he was assigned to observe. The accident occurred around midnight when Anderson's vehicle failed to successfully navigate a curve in the road. A professional engineer testifying on behalf of Anderson's family concluded that speed was the proximate cause of Anderson's fatal accident, though other factors were also implicated, including alcohol, darkness, and road curve design.

Veracity presented evidence that Anderson was intoxicated at the time of his death. It did not raise a statutory defense of intoxication. Instead, it offered the evidence for the purpose of establishing that Anderson had removed himself from the course of his employment and was engaged in personal endeavors at the time of his accident.

Two experts testified regarding Anderson's level of intoxication and its effect on his person. Anderson's blood alcohol content was 0.221 at the time of his death, indicating that he had ten to eleven alcoholic drinks in his system at the time of his death. This led them to conclude that Anderson could not have been performing his duties for Veracity at the time of his accident.

Representatives of the Blue Springs Police Department testified that the following "tools of the trade" were found in Anderson's hotel room (and, thus, were not with him in his car the night he died): laptop computer, metal clipboard, cam-

corder, tapes for camcorder, cell phone, cell phone charger, and cell phone earpiece. Anderson's accident was apparently caused by his going too fast for the road curvature. There were no empty alcohol bottles in Anderson's car after the accident. The officers could not say whether alcohol consumption was a proximate cause of the accident. An open bottle of Jack Daniels was found in Anderson's hotel room but the officer who found it could not speculate as to how much alcohol remained in the bottle. Another officer testified that upon arriving at the scene of the accident, he could not smell alcohol on Anderson. The officers were unable to determine the speed Anderson's vehicle was travelling when the accident occurred.

Vidal Alexander, a co-worker of Anderson at Veracity, testified that he and Anderson had performed the same tasks for Veracity at the time of Anderson's death. He stated that the normal hours of operation when doing surveillance are from 6:00 a.m. until 2:00 p.m. If an investigator is going to conduct surveillance beyond that time period, the investigator must obtain approval from a supervisor. He also testified that the Veracity company policy is clear that under no circumstances is an investigator to engage in surveillance while drinking or with alcohol in his system.

As investigators for Veracity, Alexander and Anderson consistently utilized specific tools of the trade to perform their jobs, including a laptop computer, a clipboard, a camcorder, extra tapes for the camcorder, a cell phone, cell phone charger, and a cell phone earpiece. Alexander stated that an investigator could not perform his job without each of these items in his possession. Alexander stated that Veracity requires its investigators to keep a cell phone with them at all times, including while on vacation.

After Anderson died, Alexander took over surveillance of the person whom Anderson was assigned to observe at the time of his death. Alexander clearly recalled this surveillance assignment. He stated that at no time was he instructed by Veracity to engage in any surveillance of the subject outside the normal 6:00 a.m. to 2:00 p.m. surveillance hours.

The president of Veracity testified that Anderson was given a vehicle allowance of $800 per month. He further stated that Anderson could videotape claimants at night if his supervisor approved it or if the investigator was so instructed by a supervisor. Otherwise, the normal surveillance times were from 6:00 in the morning until 3:00 in the afternoon. No evidence was presented that Anderson requested or received authorization to conduct surveillance after 2:00 or 3:00 p.m. on the afternoon of his fatal accident.

The administrative law judge concluded that Veracity's untimely answer did not prevent it from defending against Anderson's family's claim. She further found that Anderson's fatal accident did not arise out of and was not in the course and scope of his employment. The judgment awarded no benefits. The Labor and Industrial Relations Commission ("the Commission") agreed.

Anderson's family appeals.

## Standard of Review

■ "The Missouri constitution, article V, section 18 provides for judicial review of the commission's award to determine whether the award is 'supported by competent and substantial evidence upon the whole record.'" *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo.

banc 2003).[1] Section 287.495.1 further indicates that an appellate court "shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the Commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the Commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award."

"The constitutional standard ('supported by competent and substantial evidence upon the whole record') is in harmony with the statutory standard ('sufficient competent evidence in the record')." *Hampton*, 121 S.W.3d at 222.

■ "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, *i.e.*, whether the award is contrary to the overwhelming weight of the evidence." *Id.* at 222–23. "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Id.* at 223. "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.*

■ "There is nothing in the constitution or section 287.495.1 that requires a reviewing court to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award."

*Id.* Appellate review entails a "determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award." *Id.* "This standard would not be met in the rare case when the award is contrary to the overwhelming weight of the evidence." *Id.* Absent fraud, the Commission's findings of fact are conclusive and binding on appeal. Section 287.495.1. "Where, as here, the Commission's award attaches and incorporates the ALJ's award, this court considers the findings and conclusions of the Commission as including the ALJ's award." *Vickers v. Mo. Dep't of Pub. Safety*, 283 S.W.3d 287, 291 (Mo.App.2009).

■ "In a workers' compensation case, the statute in effect at the time of the injury is generally the applicable version." *Chouteau v. Netco Constr.*, 132 S.W.3d 328, 336 n. 3 (Mo.App.2004). Thus, the statutes in effect in 2003 are applicable to Anderson's family's claim for compensation.

## Untimely Answer

Veracity filed its answer more than a year after Anderson's family filed their claim with the Division of Workers' Compensation. No party claims that the answer was timely. The parties disagree about the effect of the untimely answer, though. Anderson's family claims that Veracity's failure to file a timely answer resulted in Veracity admitting that a compensable accident occurred. Veracity acknowledges that its failure to file a timely answer resulted in an admission of the facts alleged in Anderson's family's claim for compensation. However, it asserts that whether Anderson's death arose out

---

1. We note that several cases overruled by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003), to the extent that they are in conflict with the holding therein, are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. No further acknowledgment of *Hampton*'s effect on those cases will be recited hereafter.

of and in the course and scope of his employment is a question of law that could not be waived.

The administrative law judge agreed with Veracity's position. Item 8 of the claim for compensation required Anderson's family to state what Anderson was doing and how the fatal injury occurred. The following was pleaded in that paragraph:

The employee, while in the course and scope of his employment, was suddenly, violently, and unexpectedly caused to leave the roadway while in his vehicle, plowing through a chain link fence, directly resulting in his death.

The administrative law judge determined that the facts alleged, and subsequently admitted by Veracity's untimely answer, are that Anderson was:

1. suddenly, violently and unexpectedly caused to leave the roadway,
2. while in his vehicle,
3. plowing through a chain link fence,
4. directly resulting in his death.

The administrative law judge determined that the legal conclusions that Anderson was acting in the course and scope of his employment was *not* admitted by Veracity's untimely answer. Thus, it concluded that Veracity could present evidence that Anderson's death did not arise out of and in the course of his employment.

Anderson's family relies primarily on *Lumbard–Bock v. Winchell's Donut Shop*, 939 S.W.2d 456 (Mo.App.1996). In *Lumbard–Bock*, the employee was a store manager for a donut shop. 939 S.W.2d at 456. One morning, she dropped a change purse as she was getting into her car to come to work. *Id.* When she reached down to pick up the purse from her driveway, she felt something pull or pop in her lower back.

*Id.* This resulted in stiffness, but she proceeded to work. *Id.* That same morning, while lifting a cola container, she felt a pop in her lower back and became dizzy. *Id.* at 456–57. The employee was subsequently plagued with back problems and eventually had surgery on her back. *Id.* at 457.

The employee filed a workers' compensation claim for her back injury. *Id.* "In the portion of the claim form calling for a statement as to: '*How injury occurred, cause, and work employee was doing for employer at the time,*' [the employee] responded: '*While employee was lifting a coke container at work, she felt something pop in her back necessitating disc surgery.*' " *Id.* (emphasis added). The employer failed to file a timely answer to the claim. *Id.* The administrative law judge determined that the employee was injured while at home, as opposed to being injured while at the work location, and denied benefits. *Id.* at 458. The employee appealed the Commission's affirmance to this court.

The employee contended that by failing to file a timely answer, her employer admitted the fact that her accident occurred "at work" and that it resulted in some injury to her. *Id.* at 456. The court obviously viewed the statement "at work" as a factual assertion as to physical location and as to how the accident occurred. The court noted that the consequence of failing to file a timely answer is that the factual statements made in the claim for compensation shall be deemed admitted. *Id.* at 457 (*citing* 8 C.S.R. 50–2.010(13) [2]). "Prior cases have applied this regulation and held that statements of fact in the claim, such as statements concerning the fact of injury, will be deemed admitted where no timely answer has been filed." *Id.*

---

2.  Now found at 8 C.S.R. 50–2.010(8).

The court went on to state: "Of course, failure to file a timely answer cannot result in admission of legal conclusions contained in the pleading." *Id.* at 457–58. "Similarly, it is still incumbent on the Commission to determine legal questions such as 'whether a claimant's injury arose out of or in the course of the claimant's employment.'" *Id.* at 458.

The employee in *Lumbard–Bock* argued that "while the Commission's decision purports to simply consider the legal issue of whether her injury arose out of and in the course of employment, in fact, it redetermines the factual issues of whether the work accident occurred and whether it contributed to her back injury." *Id.* She went on to state "that only by redetermining these issues and deciding them against her could the Commission have reached the legal conclusion that the injury did not arise out of her work." *Id.* This court agreed, stating that the employer's untimely answer is an admission *of the facts* in the employee's claim, "including both her statement of the facts regarding how the injury occurred—that she felt something pop in her back while lifting a cola container at work—and her statement of causation—that this pop is what necessitated the disc surgery." *Id.* "Given the admitted fact that the injury occurred at work while [the employee] was performing a required work function [for the donut shop], the only way to resolve the legal issue is by finding that the injury did arise out of and in the course of employment." The court quite obviously viewed the allegation in that context as being a factual assertion as to her physical location as well as to the injury causation. *Id.* at 459.

The court remanded for a determination of whether the employer's answer was untimely. *Id.* If the Commission so determined, the Commission was directed to address what percentage of the employee's injury was attributable to her work accident as opposed to attributable to prior injuries, including the incident of picking up her purse off her driveway. *Id.*

The court in *Lumbard–Bock* relied on *Jackson v. Midwest Youngstown Industries,* 849 S.W.2d 709 (Mo.App.1993). In *Jackson,* the employee stopped at the post office on the way from her home to work. *Id.* at 710. "She picked up a personal package from her daughter and mailed a sympathy card to prospective customers who had experienced a death in the family." *Id.* at 710–11. As she was returning to her car, the employee fell and injured her knee. *Id.* at 711.

The employer's answer to the employee's claim for compensation was not timely filed. *Id.* The employee argued on appeal that because of the employer's untimely answer, "her employment status and claim that her injuries arose out of and in the course of her employment must be taken as admitted." *Id.* at 711 (*citing* 8 C.S.R. 50–2.010(12) and (13)). Citing prior case authority, the court held that "the provision in 8 C.S.R. 50–2.010(13) that the 'statements' in a claim shall be taken as admitted for failure to file a timely answer does not include an admission of the legal question whether a claimant's injury arose out of or in the course of the claimant's employment." *Id.* The Commission upheld the denial of benefits.

In *Ward v. Mid–America Fittings,* 974 S.W.2d 586 (Mo.App.1998), the court stated that the employer's failure to timely file its answer or seek an extension required the Commission to deem the employer as having "admitted the *allegations*" in the employee's claim. *Id.* at 587 (emphasis added). Anderson's family relies on the emphasized "allegations" to argue that everything in the claim for compensation is deemed admitted, including the assertion

that Anderson died in the scope and course of his employment.

In *Ward,* the employee alleged that her chair rolled out from under her and that she struck her head. *Id.* at 588. She also alleged a second incident where she fell from her chair. *Id.* The Commission decided that the employee's testimony that she fell at the work place and suffered work-related injuries was not credible and that she failed to prove that she suffered an injury by accident arising out of and in the course of her employment. *Id.* This court held that the Commission's decision was error because the employer was deemed to have admitted that the employee was injured at work. *Id.*

Here, on appeal, Anderson's family claims that *Lumbard–Bock* (Western District) conflicts with *Jackson* (Eastern District) and asks this court to resolve the conflict. They also argue that *Lumbard–Bock* and *Ward* support their argument that the assertion that Anderson died in the course and scope of his employment was admitted because of Veracity's untimely answer. We disagree. *Lumbard–Bock, Jackson,* and *Ward* are all in essential agreement that an untimely answer results in admission of factual allegations in the claim for compensation. Whether an injury was in the course of employment, however, is a legal question not admitted by an untimely answer. *See Lumbard–Bock,* 939 S.W.2d at 458; *Jackson,* 849 S.W.2d at 711; *Ward,* 974 S.W.2d at 588.

Anderson's family further claims that the pleading in *Lumbard–Bock* and their pleading is "virtually identical." The pleading in *Lumbard–Bock* was that the employee hurt her back "at work." 939 S.W.2d at 457. The pleading in their case was that Anderson died "while in the course and scope of his employment." They state that a finding that the pleading in *Lumbard–Bock* and the pleading in

their case are not identical would result in this court imposing a technical pleading requirement in a workers' compensation claim. We disagree. There is a difference between the physical location of an accident and the legal conclusion that an accident met the statutory criteria for compensability. "Whether an accident and the consequent injury arose out of and in the course of employment is ultimately a question of law." *Garrett v. Indus. Comm'n,* 600 S.W.2d 516, 519 (Mo.App.1980). The allegations in *Lumbard–Bock* and *Ward* pertained to the physical aspects of the employee's injury. In the current case, all parties agree that Anderson's accident occurred on a roadside. There is no dispute pertaining to the facts of Anderson's accident—the dispute is only as to whether the accident occurred, as a matter of law, in the course and scope of his employment.

Anderson's family further notes that Veracity could have sought leave to file its answer out of time, yet it did not do so. They argue that affirming the judgment in this case would nullify the intended penalty for an employer's failure to file a timely answer. This is incorrect. An employer who fails to file a timely answer or seek permission to file an answer out of time suffers a consequence. All factual allegations in the claim for compensation are deemed admitted. As seen in *Lumbard–Bock, Jackson,* and *Ward,* that consequence may be significant when the parties dispute the facts of how and where the injury occurred.

The point is denied.

## Course of Employment

In their second point, Anderson's family claims that the Commission erred as a matter of law in finding that Anderson's fatal accident did not arise out of and in the course of his employment with Veraci-

ty. They cite *Blatter v. Missouri Department of Social Services, Division of Aging*, 655 S.W.2d 819 (Mo.App.1983), and *Baldridge v. Inter–River Drainage District of Missouri*, 645 S.W.2d 139 (Mo.App.1982), for the proposition that Anderson's travel should be held to be in the course of employment continuously during his trip except where a distinct departure on a personal errand is shown. They cite *Miller v. Sleight & Hellmuth Ink Co.*, 436 S.W.2d 625 (Mo.1969), as a case factually similar to theirs.

In *Blatter*, an employee's widow and son filed a claim for compensation for the employee's death while on a business trip. 655 S.W.2d at 821. The employer appealed the Commission's ruling in favor of the employee's family. *Id.* On appeal, the employer argued that there was not sufficient competent evidence in the record to support the finding that the fatal accident arose out of and in the course of the employee's employment. *Id.*

The employee was in Springfield, Missouri, with thirty-three other employees for a two-day training session that was held in a motel. *Id.* The session was on a Thursday and Friday. *Id.* Attendance at the session was mandatory. *Id.* Employees travelling a distance to attend the session were provided with hotel rooms, which were paid for by the employer. *Id.* The employer also paid for the cost of travel and meals for attendees. *Id.*

An agenda for Thursday's events did not contain an evening session. *Id.* However, during the day on Thursday, two supervisors announced that a social activity at a restaurant would take place on Thursday evening. *Id.* at 821–22. This social event was not mandatory. *Id.* at 822. A supervisor testified that the social function was useful and helpful for employees. *Id.*

The employee died walking across the street while going from the site of the social function to his hotel room. *Id.* at 822–23. The Commission found the following:

> In considering the fact that informal meetings are normally held after scheduled meetings and that it provides an open forum for the employees to discuss any problems, it is my opinion that the informal meeting has by custom and/or practice become an incident of employment and therefore any injuries sustained as a result of the informal meeting would arise out of and in the course of the employment. Perhaps [one of the employee's supervisor's testimony] went to the crux of the matter when she testified that the informal meetings were beneficial and that she could learn a lot and could ask a question and get an answer.

*Id.* at 823. The employer challenged the finding that the employee's death arose out of and in the course of employment.

The appellate court noted that the claimants seeking compensation bear the burden of proof to show that an employee's death "resulted from an accident 'arising out of and in the course of his employment.'" *Id.* "An injury arises 'out of' the employment if it is a natural and reasonable incident thereof and is the rational consequence of some hazard connected with the employment." *Id.* "An injury arises 'in the course of' the employment when it occurs within the period of employment, at a place where the employee may reasonably be and while he is reasonably fulfilling the duties of his employment." *Id.* There is no holding in *Blatter* that the death was compensable merely because it occurred while the deceased was out of town on a trip related to business.

"The terms 'out of' and 'in the course of' the employment are not synonymous but are separate tests for compensa-

bility, and both must be satisfied before the claimants here may prevail." *Id.* "There is no all embracing definition of the phrase 'arising out of and in the course of his employment,' and every case involving the phrase should be decided upon its own particular facts and circumstances and not by reference to some formula." *Id.* "Where, as here, there is no significant factual dispute, the issue of whether an accident and the consequent injury or death arose out of and in the course of employment is ultimately a question of law." *Id.*

"Missouri cases have emphasized that it is the nature of the employee's activity at the time of the injury itself which governs the issue of compensability." *Id.* "It is not sufficient that the employment may simply have furnished an *occasion* for an injury from some unconnected source." *Id.* Missouri has generally rejected the so-called 'positional-risk theory' under which an accident becomes compensable on a mere showing that it would not have happened but for the fact that the conditions or obligations of the employment put claimant in the position where he was injured. *See id.* "It is not sufficient that the victim's employment caused him to be at the place where it happened." *Id.*

"A claim is not compensable if, at the time of the injury, the employee is engaged in pleasure purely his own." *Id.* "On the other hand, [a]n injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is usually compensable, for when some advantage to the employer results from the employee's conduct, his act cannot be regarded as purely personal and wholly unrelated to the employment." *Id.* "Accordingly an injury resulting from such an act arises out of and in the course of the employment; and this rule is applica-

ble even though the advantage to the employer is slight." *Id.* at 823–24. "The 'concurrent benefit' principle cannot be applied without limitation. Eventually, the indirect benefit to the employer becomes so tenuous as to be imperceptible." *Id.* at 824.

"In some situations while an employee is away from his employer's place of business in a traveling capacity, an injury sustained while traveling from a hotel or place of business activity to a place to eat does arise out of and in the course of his employer's business." *Id.* "[I]njuries sustained by an employee in connection with an employer-sponsored event usually occur while the employee is not performing the duties for which he was employed." *Id.* Thus, "the inquiry is whether the social affair is sufficiently related to the employment to justify the conclusion that the injury arose out of and in the course of employment." *Id.* The primary elements to be considered in determining the compensability of the injury include: "[w]hether the employee who was injured while attending/traveling to or from an employer-sponsored social affair was compelled, whether directly or indirectly, to attend the event; whether the employer derived some benefit from his sponsorship of the function; the extent to which the employer sponsored, controlled, or participated in the activity; and whether the social affair was a benefit or consideration of the employment to which the employee was entitled." *Id.*

To receive benefits, the claimant must show:

that at the time of the accident, the employee was not exercising a personal privilege for his own benefit, wholly apart from his employment or his employer's interest. Where the trip or attendance at the meeting, conference or

convention is clearly for the employee's own interest and not necessarily in any way for the benefit of his employer, compensation will be denied. Where the trip or attendance is one which the employer ordered or directed, or is for the sole benefit of the employer, or is to the mutual advantage of both the employer and his employee, compensation may be recovered.

*Id.* at 825. Generally, employees whose work entails travel away from the employer's premises are held to be within the course of their employment continuously during the trip, except when there is a distinct departure on a personal errand is shown. *See Id.* Thus, injuries arising out of "the necessity of sleeping in hotels or eating in restaurants away from home" are usually held compensable. *Id.*

On appeal, the employer in *Blatter* argued that the employee's trip to Springfield was employment motivated but that his travel to and from the social event was not necessitated by his employment. *Id.* at 824. The court stated that "[t]he inquiry . . . is whether the social event . . . was sufficiently related to [the employee's] employment to justify the conclusion that his death arose out of and in the course of the employment." *Id.* at 825–26. The court noted that the social event was a " 'settled practice' known to the employer." *Id.* at 825. Approximately one-third of the employees in attendance at the two-day session attended the social event, including several supervisors. *Id.* The employee was not required to attend the social event, "but, during the course of the business session earlier that day, such attendance was repeatedly encouraged by [two supervisors]." *Id.* at 826. "In the sense that there would be no reimbursement for the cost of drinks, the [social event] was not 'sponsored' by the employer." *Id.* The court further noted, however, that "[t]o some extent" the employer (through the supervisors), participated in the social event. *Id.* The social event "was not a benefit or consideration of the employment to which [the employee] was 'entitled,' but the record supports the finding that some benefit, admittedly slight, was derived by the employer from the informal discussions which took place at [the social event] and from the opportunity for such discussions." *Id.* These discussions included one between the employee and a supervisor. *Id.* The court concluded that "[t]his is a very close case," but "there was sufficient competent evidence in the record to warrant" the conclusion that the fatal accident arose out of and in the course of the employee's employment. *Id.*

In *Baldridge v. Inter–River Drainage District of Missouri,* 645 S.W.2d 139 (Mo. App.1982), an employer appealed the judgment awarding benefits to an employee's widow and claimed that "there was no substantial or competent evidence to show that the deceased was killed by an accident arising out of and in the course of his employment." The employee was a dragline and bulldozer operator. *Id.* at 140. On the date of his death, he traveled to two nearby towns to look for parts for the dragline he was operating. *Id.* He purchased some parts and had a conversation with a man who occasionally repaired the employer's equipment. *Id.* The employee then ate in a cafe between 4:30 and 5:00 in the afternoon. *Id.* The employee was killed in a car accident at 5:25, presumably on his way home. *Id.* One of the employee's supervisors subsequently retrieved parts for the dragline from the scene of the accident. *Id.*

The court held that evidence was presented from which the Commission could conclude that the employee was going home and was in the vicinity of the accident nearing the end of a trip created by

the duties of his employment. *Id.* The court noted that if an employee's work entails travel away from the employer's premises, the employee is held to be within the course of their employment during the trip, except when on a distinct personal errand. *Id.* In this case, found the court, the trip would not end until the employee returned home. *Id.* at 140–41. Even if the employee eating in a cafe was a deviation from employment, the employee was following a direct route home at the time of the accident and, thus, "would have again been in the course of his employment." *Id.* at 141. The court affirmed the award of benefits. *Id.*

In *Miller v. Sleight & Hellmuth Ink Co.,* 436 S.W.2d 625, 626 (Mo.1969), the widow and child of a deceased employee were denied compensation. The employee was a salesman and branch manager for employer. *Id.* He called on customers of his employer in the metropolitan Kansas City area and in Kansas and Oklahoma. *Id.* "He also supervised the activities of two other salesmen, one located in Kansas City and the other in Dallas, Texas." *Id.* "He did not maintain established hours of work but made calls on customers at his convenience and responded to calls from customers when the occasion demanded." *Id.* The employee "was furnished a company-owned automobile to use in his work, and his employer paid his travel expenses including lodging, meals, and the expenses of the automobile." *Id.*

The employer's national sales manager sent the employee to Dallas, Texas, to investigate the possibilities of employing a person to replace a salesman previously located there but who had terminated his employment. *Id.* at 627. The employee left Kansas City in his employer's automobile and drove to Oklahoma City where he spoke before a "Litho Club." *Id.* "He then flew to Dallas, and while there he used an automobile belonging to his employer which it had furnished to the salesman who had quit." *Id.* The employee called on a customer of the employer and "discussed with him matters pertaining to his employer's business, including persons who might be employed as a salesman." *Id.* The employee told the customer that "he had some other calls to make, that he was going to pick up some ink and take it back to Kansas City, and that he planned to leave Dallas the following morning to start back to Kansas City." *Id.* The employee also asked the customer to recommend a place to eat, and the customer did so. *Id.* The employee left the customer's office at about 6:30 p.m. *Id.*

That night, the employee and a woman went to dinner at the restaurant recommended by the customer. *Id.* The employee and the woman left at midnight and arrived at the woman's home at 12:30 a.m. *Id.* The employee left, saying he was going to find something to eat. *Id.* The woman was not a customer, and the employee did not engage in any business with the woman. *Id.* The employee was killed in a car accident at about 1:00 a.m. *Id.*

The Commission found that the employee did not sustain an accident arising out of and in the course of his employment. *Id.* The appellate court stated that the employee's activities were comparable to a traveling salesman and were "considered incident to his employment so long as he performs them in a normal manner and does not step aside from his employment for personal reasons." *Id.* at 628. It went on to state, however, that when the employee "abandons or steps aside from his employment and duties connected therewith and engages in work or pleasure purely his own, and while so engaged receives accidental injuries, his employer is not liable because the accident does not

arise out of and in the course of the employee's employment." *Id.*

There was no dispute about the fact that while the employee was with the woman, he was not engaged in any duty in connection with his employment. *Id.* The employee's family argued that the employee resumed his employment duties after he left the woman and was thus killed while in the course of his employment. *Id.* The court noted that when the employee "abandoned his personal mission and returned to the performance of the duties of his employer is a question of fact to be determined by the Commission." *Id.* "The test of when a deviation begins or terminates is not so much a matter of the time consumed and the distance traveled, but rests primarily on whether the employer's or the employee's purpose is being served." *Id.* "In some situations while an employee is away from his employer's place of business in a traveling capacity, an injury sustained while traveling from a hotel or a place of business activity to a place to eat does arise out of and in the course of his employer's business." *Id.* "However, it is quite possible to find, in particular circumstances, that a personal social motive was the occasion for the mealtime excursion." *Id.* (internal citation marks and quotations omitted). The court concluded that the Commission was free to believe that the employee's action when the accident occurred was a continuation of the deviation from employment for personal reasons and was not "in the furtherance of the employer's business." *Id.* at 628–29. It affirmed the denial of benefits. *Id.* at 629.

■ Citing the above cases, Anderson's family claims that they established that Anderson was in Blue Springs in the course of his employment, and Veracity bore the burden of showing a personal deviation from the course of employment. They have misconstrued the case

authorities, which do not create a bright-line rule to the effect that anytime the employee is out of town on his employer's business and is killed in an accident there is a conclusive presumption of compensability.

■ We acknowledge that Missouri cases recognize that "[i]n the case of a traveling employee, the employee is considered to be in the course of his employment continuously during the trip except when a distinct departure on a personal errand is shown," and that during such travel "injuries arising out of the necessity of sleeping in hotels or eating in restaurants away from home to perform the employer's purpose are usually compensable." *Smith v. District II A and B,* 59 S.W.3d 558, 565 (Mo.App. W.D.2001); *see also, e.g., Doerr v. Teton Transp., Inc.,* 258 S.W.3d 514, 523 (Mo.App. S.D.2008); *Custer v. Hartford Ins. Co.,* 174 S.W.3d 602, 611 (Mo.App. W.D.2005) (*en banc*); *Evans v. Consumer Programs, Inc.,* 849 S.W.2d 183, 188 (Mo.App. S.D.1993). However, nothing in such decisions shifts the underlying burden of proof from the employee to show that he was acting in the course and scope of his employment at the time of a particular incident. Moreover, as the cases demonstrate, any inference or presumption arising from the fact that an employee in a particular case was injured while on a business trip must yield to specific evidence, in a particular case, as to the circumstances surrounding a particular worker's injuries.

■ Anderson's family makes the following arguments in support of their claim that Anderson's death occurred in the course and scope of his employment: Anderson was away from his home on the date of the accident because his work required him to be there; Anderson was required to be available to Veracity twenty-four hours a day; Anderson was re-

quired to keep his cell phone with him at all times; Veracity allowed its employees to take a meal break when working; Anderson was given a vehicle allowance; there is no evidence Anderson was on a personal errand at the time of his death; there was no evidence Anderson deviated from his work duties; Veracity did not dictate when and where employees could eat while on overnight assignments; investigators could videotape suspects at night with supervisor permission; Anderson's supervisor did not testify at the hearing, so it is unknown what communication occurred between Anderson and his supervisor; and no one knows where Anderson was going at the time of the accident, so there is no evidence Anderson was on a personal errand.

In response to the foregoing arguments, we note that Anderson had none of the tools of his trade in his car (laptop, clipboard, camcorder, tapes for camcorder, cell phone, cell phone charger, cell phone earpiece) that are required when conducting surveillance. The accident occurred around midnight, many hours after Anderson's normal quitting time. There was no evidence that Anderson had been authorized or requested to work past normal working hours. Anderson was intoxicated at the time of the accident. Consumption of alcohol while on the job was not permitted. A reasonable fact finder could conclude from the evidence that Anderson's accident did not arise out of and in the course of his employment.

Substantial evidence presented here supported the determination that Anderson was not serving his employer's interests at the time of the accident. Any inference of compensability arising from the mere fact that Anderson was out of town on his employer's business at the time of the accident was effectively rebutted by the evidence. *Id.* at 823.

The Commission's award is supported by competent and substantial evidence upon the whole record. The evidence deemed credible by the administrative law judge supports the conclusion that Anderson's fatal accident did not arise out of and in the scope of his employment with Veracity.

The point is denied.

## Conclusion

The judgment is affirmed.

All concur.