

# Missouri Court of Appeals
## Southern District
### Division Two

| | | |
|---|---|---|
| TERRY LANKFORD, DECEASED, | ) | |
| | ) | |
| Employee, | ) | |
| | ) | |
| CAROL LANKFORD, WIDOW, | ) | No. SD34269 |
| | ) | Filed: January 17, 2017 |
| Claimant/Dependent/Respondent, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NEWTON COUNTY, | ) | |
| | ) | |
| Employer/Appellant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TREASURER OF MISSOURI | ) | |
| AS CUSTODIAN OF SECOND INJURY FUND, | ) | |
| | ) | |
| Additional Party. | ) | |

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

**AFFIRMED**

Newton County ("Employer") appeals the "Final Award Allowing Compensation" ("Final Award") of the Labor and Industrial Relations Commission ("Commission") finding Terry Lankford ("Lankford") permanently and totally disabled, and concluding Employer was liable for his benefits. As Lankford was deceased at the time of the Final Award, the benefits were awarded to his wife, Carol Lankford ("Mrs. Lankford"). We affirm the decision of the Commission.

## Factual and Procedural Background

Lankford began working for Employer on August 17, 1987. Over the years, he worked a number of positions for Employer. In approximately 1998, Lankford began working in the prosecutor's office as an investigator.

In 2002, Lankford was exposed to anhydrous ammonia while investigating a mobile meth lab. He had no breathing problems prior to this exposure. Thereafter, he was diagnosed with chronic obstructive pulmonary disease ("COPD").

When Lankford began work at the prosecutor's office, he smoked in the area in the basement provided by Employer. He began going up on the roof to smoke at the suggestion of an assistant prosecutor. After that, he preferred the roof because it was quiet and he could think about the case he was working on. The roof of the courthouse was a popular place for pigeons, and pigeon droppings accumulated there. While on the roof, other deputies, investigators, and city detectives would seek Lankford out to talk to him about work-related matters.

Lankford left his job with Employer in December 2007, after lung surgery and a subsequent stroke left him unable to work. On April 11, 2008, Lankford filed a Claim for Compensation asserting that during the course and scope of his employment with Employer, he was exposed to pigeon droppings and as a result, sustained injury to his lungs and respiratory system. Employer filed an answer to the claim for compensation disputing the allegations therein. Lankford gave his deposition on January 21, 2009.

On June 15, 2012, Lankford died due to complications of pneumonia and COPD. On or about September 6, 2012, a "Suggestion of Death" was filed notifying the Division of Workers' Compensation ("the Division") of Lankford's death. Thereafter, a "Motion for Substitution" was filed and Mrs. Lankford was substituted as "claimant."

On January 9, 2015, a hearing was held before the Administrative Law Judge ("ALJ"). The Lankfords' testimony, as well as the medical evidence, were all submitted through depositions, medical records, and medical reports.

### *Lankford's Testimony*

Lankford testified consistent with the facts set forth above. In addition, Lankford testified he had been married to Mrs. Lankford for 39 years. Lankford had a son and a daughter, but neither relied on him for support.

Lankford worked for Employer for approximately 21 years, his last position being an investigator for the prosecutor's office. Lankford's duties as an investigator were to track down and interview victims and witnesses. He would also help "the girls around the office[.]"

After being diagnosed with COPD in 2002, Lankford experienced intermittent shortness of breath and had several bouts of bronchitis and pneumonia. His symptoms worsened prior to his diagnosis in December 2007 of a right lung nodule believed to be cancerous.

On December 22, 2007, Lankford underwent surgery to remove the nodule and half of his right lung (lobectomy procedure), which was then found to be non-cancerous, but rather identified as "cryptococcus."[1] After surgery, Lankford was placed in an induced coma. Lankford suffered a stroke sometime while in the induced coma, which resulted in right-sided weakness. After regaining consciousness, Lankford had severe problems with his hands that proved to be bilateral carpal tunnel requiring surgery. Lankford also had trouble walking necessitating the use of a cane, and experienced continued problems with speech and breathing.

---

[1] A type of fungus that lives in the environment throughout the world, typically found in soil, on decaying wood, in tree hollows, or in bird droppings. https://www.cdc.gov/fungal/diseases/cryptococcosis-neoformans/causes.html (last visited on November 28, 2015).

### Mrs. Lankford's Testimony

Mrs. Lankford's deposition was taken on March 13, 2014. Mrs. Lankford testified she visited her husband at the prosecutor's office about once a month for lunch. She would sometimes meet him on the rooftop where she would smoke and visit with him. Lankford's co-workers would sometimes come up to discuss work when she was there. She described the roof as a 12-by-20-foot area with railings around three sides. She observed pigeon droppings on the railings and walls.

### Dr. Allen Parmet's Testimony

The deposition of Dr. Allen Parmet ("Dr. Parmet"), board certified in occupational medicine and aeronautic medicine, was taken on November 16, 2009. Dr. Parmet testified consistent with his report. He testified that at the request of Lankford's attorney, he performed a medical evaluation of Lankford, and authored a report on August 11, 2008. Dr. Parmet explained that the nodule removed from Lankford's right lung was biopsied, which disclosed two identifiable infectious diseases: a fungus known as "Cryptococcus laurentii" ("Crypto") and a bacteria called "Mycobacterium avium intracellulare"[2] ("MAI"). Dr. Parmet opined that the Crypto and MAI arose from Lankford's repeated and periodic exposure to the pigeon droppings during his employment with Employer, and his occupational activities at Employer were the prevailing factor in causing the Crypto and MAI. He opined the lobectomy was necessary to treat those conditions and the surgical complication—Lankford's stroke—was a direct consequence of the treatment Lankford received for the two infections.

Dr. Parmet concluded that Lankford had reached maximum medical improvement as of the time of his examination and was permanently and totally disabled due to the effects of the stroke

---

[2] An infection which causes respiratory illness in birds, pigs and humans especially in immunocompromised people. https://en.wikipedia.org/wiki/Mycobacterium_avium-intracellulare_infection (last visited on January 6, 2017).

"since he's got hemiparesis, he's got contractures, and he's got cognitive dysfunction," and "[t]his [was] not something that you could take a person and readily put them back to work under any circumstances." It was Dr. Parmet's opinion, within a reasonable degree of medical certainty, that Lankford was permanently and totally disabled solely from the stroke, which was a direct result of the Crypto and MIA, and independent of all Lankford's prior problems.

### Dr. Paul M. Jost's Testimony

The deposition of Dr. Paul M. Jost ("Dr. Jost"), a board certified infectious disease physician, was taken on December 1, 2010. Dr. Jost testified consistent with his report. Dr. Jost evaluated Lankford on May 25, 2010, at the request of Employer. Dr. Jost concluded that, within a reasonable degree of medical certainty, Lankford did not suffer from Crypto, but rather from MAI. He did not think the MAI was caused by Lankford's exposure to pigeon droppings during his employment with Employer because the MAI "organism is so prevalent in the environment that [Lankford] could have picked it up on numerous possible occasions and to tie it to one specific location at this time would basically be impossible." However, on cross-examination, Dr. Jost agreed that Lankford could have been exposed to MAI through his employment with Employer, and that he could not rule out Lankford's work as a source of his exposure to MAI.

### Dr. Hunter Hofmann's February 15, 2014
### Medical Evaluation Report

Dr. Hunter Hofmann's ("Dr. Hofmann") February 15, 2014 report was entered into evidence. Dr. Hofmann was board certified in internal medicine, and reviewed Lankford's medical records at the request of Employer. In that report, Dr. Hofmann concurred with the findings of Lankford's infectious disease doctor, Dr. Eden Esquerra, that Lankford did not suffer from Crypto, but suffered only from MAI. Dr. Hofmann opined that it was Lankford's cigarette smoking that was the primary cause of his pulmonary conditions, including the contraction of MAI. However,

5

Dr. Hofmann noted it was "also possible that [Lankford] was exposed [to MAC[3]] with his habit of taking smoking breaks." Dr. Hofmann concluded that the diagnosis of MAI was what resulted in Lankford's lobectomy in December 2007.

### Dr. Allen Parmet's June 11, 2014 Report

Dr. Parmet authored a second report dated June 11, 2014, which was admitted into evidence. This report was issued after Dr. Parmet's review of additional materials, including the reports of Dr. Hofmann and Dr. Jost. Dr. Parmet stated that his opinions were unchanged. He noted that while Dr. Hofmann and Dr. Jost agreed Lankford did not suffer from Crypto, the MAI infection "clearly was present." He further noted that "[t]he subsequent complications of [Lankford] . . . stems from the evaluation of the fungal infection and biopsy, which resulted in the complication." Dr. Parmet concluded that:

> While smoking is certainly the initial cause of his chronic obstructive pulmonary disease which potentiated the infection, my opinion remains that [Lankford]'s occupational exposure at the Newton County Courthouse was the most likely cause of his MAC infection and therefore ultimately rendered him Permanently and Totally Disabled and led to his death. Clearly, his pre-existing pulmonary conditions and other pre-existing problems were contributing factors and hastened his demise.

### Dr. Eden Esguerra's July 15, 2011 Report

Dr. Eden Esguerra ("Dr. Esguerra"), an infectious disease specialist, first saw Lankford in December 2007, after he underwent a right upper lung lobectomy. The cultural from the right upper lobe was positive for Crypto. Lankford was then treated with appropriate medication. He completed treatment with her in December 2009. In April 2011, Lankford resumed treatment with Dr. Esguerra. It was Dr. Esguerra's opinion that Lankford likely acquired Crypto through

---

[3] The record uses the terms "MAI" and "MAC" interchangeably. "MAC" is the abbreviation for "mycobacterium avium complex," which is comprised of mycobacterium avium and mycobacterium intracellulare. https://en.wikipedia.org/wiki/Mycobacterium_avium-intracellulare_infection (last visited January 6, 2017).

6

inhalation. She opined that it was possible that "his job at the Sheriff's Department may have put him at risk of contracting the [Crypto] infection." She last saw Lankford on April 19, 2011.

### Dr. Hofmann's September 1, 2014 Report

Dr. Hofmann was asked to review Dr. Parmet's June 11, 2014 report and Mrs. Lankford's deposition testimony. He concluded that neither Dr. Parmet's report, nor Mrs. Lankford's deposition testimony changed his opinion from his previous report of February 15, 2014, wherein he opined that it was Lankford's smoking that led to his "structural lung disease and COPD, which predisposed him to his subsequent MAI infection," and subsequent medical complications.

### The ALJ's Award

The ALJ's Award was filed on March 3, 2015. The ALJ found that the totality of the evidence clearly established a probability that Lankford's occupational activities at Employer caused the MAI; that he experienced a greater risk of exposure to contracting MAI during his employment with Employer than in his non-work activities; and that Dr. Parmet's opinion regarding exposure and causation were more persuasive than the opinions of Dr. Hofmann and Dr. Jost.

The ALJ concluded that Lankford contracted an occupational disease—MAI—as a result of his exposure to pigeon droppings, during the course of his employment with Employer, and that such exposure was the prevailing factor in causing both Lankford's condition and disability, which ultimately led to his stroke rendering him permanently and totally disabled.

The ALJ found Lankford reached maximum medical improvement as of August 7, 2008. The ALJ ordered Employer to pay to Lankford the sum of $167,811.62 as past permanent total disability benefits. The ALJ also ordered Employer to pay to Mrs. Lankford the sum of $502.43

7

per week for ongoing permanent total disability benefits for the remainder of her life. The ALJ found no liability on the part of the Second Injury Fund.[4]

Employer filed an "Application for Review" with the Commission on March 19, 2015.

### *Commission's Final Award*

The Commission affirmed the ALJ's Award, and incorporated the ALJ's Award and findings into the Commission's Final Award.

In addition, the Commission's Final Award found that Employer's argument that Lankford failed to show he was exposed to the pathogens that caused his occupational disease to a greater extent or degree than workers in a normal, nonemployment life, was not persuasive, particularly Employer's "unequal exposure" requirement argument.[5]

The Commission found that the "unequal exposure" requirement to which the Employer referred was found in section 287.020.3(2):[6]

> An injury shall be deemed to arise out of and in the course of the employment only if:
>
> (a) It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and
>
> (b) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

In contrast, the Commission found that the criteria for compensability of an injury by occupational disease, is set forth in section 287.067.1&.2:

---

[4] Lankford did not appeal this portion of the judgment so we need not address this issue. The Second Injury Fund did not file a brief.

[5] Employer apparently expanded on its assertions of error contained in its Application for Review and developed this "unequal exposure" requirement argument in its brief submitted to the Commission. We are not privy to that exact argument as we do not have the Employer's brief submitted to the Commission.

[6] All references to statutes are to RSMo Cum.Supp. 2005, unless otherwise indicated.

1. In this chapter the term "occupational disease" is hereby defined to mean, unless a different meaning is clearly indicated by the context, an identifiable disease arising with or without human fault out of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

2. An injury by occupational disease is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability. The "prevailing factor" is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability. Ordinary, gradual deterioration, or progressive degeneration of the body caused by aging or by the normal activities of day-to-day living shall not be compensable.

The Commission found that in applying the plain language of sections 287.020.3 and section 287.067, which must be strictly construed pursuant to section 287.800.1, it could not impose the "unequal exposure" requirement found in section 287.020.3 to this claim because the statutory language contained no such requirement.

The Commission further found that in evaluating claims of injury by occupational disease, it could no longer refer to the criteria for a compensable injury by accident under sections 287.020.2 and 287.020.3, and following the 2005 amendments to Chapter 287, it was sufficient for Lankford to demonstrate that the disease he suffered was not an "'ordinary disease of life to which the general public is exposed outside of the employment.'" This appeal followed.

In three points on appeal, Employer asserts: (1) the Commission erred as a matter of law in holding that the "unequal exposure" requirement found in section 287.020.3 is not applicable to a claim alleging an injury by occupational disease; (2) the Commission erred in finding that Lankford's injury arose out of and in the course of his employment; and (3) the Commission erred in finding Lankford suffered an injury by occupational disease.

9

**Standard of Review**

A reviewing court may modify, reverse, remand for rehearing, or set aside a workers' compensation award upon a finding that: (1) the commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the commission's factual findings do not support the award; or (4) there was not sufficient competent evidence in the record to warrant the making of the award. Section 287.495.1. Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record.

Questions of law are reviewed *de novo*. This Court must defer to the commission's findings on issues of fact, the credibility of the witnesses, and the weight given to conflicting evidence. The determination of whether an accident is the "prevailing factor" causing a claimant's condition is an inherently factual one. Although the commission's decision is afforded substantial deference, this Court must still examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence.

*Malam v. Dep't of Corr.*, 492 S.W.3d 926, 928 (Mo. banc 2016) (internal quotations and citations omitted).

"This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Greer v. SYSCO Food Servs.*, 475 S.W.3d 655, 665 (Mo. banc 2015).

**Analysis**

*Point I: Applicability of "Unequal Exposure" to Injury by Occupational Disease*

In its first point, Employer argues that the Commission erred as a matter of law in holding that the "unequal exposure" requirement in section 287.020.3 is not applicable to a claim alleging an injury by occupational disease.

10

Under section 287.020.3(2)[7]:

(2)  An injury shall be deemed to arise out of and in the course of the employment only if:

(a)  It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and

(b)  It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

The criteria for the compensability of an injury by occupational disease are set forth in section 287.067, which provides in relevant part that:

1.      In this chapter the term **"occupational disease"** is hereby defined to mean, unless a different meaning is clearly indicated by the context, an identifiable disease arising with or without human fault out of and in the course of the employment.  Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section.  The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

2.      An injury or death by occupational disease is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability.  The **"prevailing factor"** is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability.  Ordinary, gradual deterioration, or progressive degeneration of the body caused by aging or by the normal activities of day-to-day living shall not be compensable.

(Emphasis in original).

"The Workers' Compensation Law distinguishes between two general categories of compensable injuries:  (1) injuries by accident; and (2) injuries by occupational disease."  ***State ex***

---

[7] "In a workers' compensation case, the statute in effect at the time of the injury is generally the applicable version." ***Anderson v. Veracity Research Co.***, 299 S.W.3d 720, 725 (Mo.App. W.D. 2009) (internal quotations and citations omitted).

*rel. KCP & L Greater Missouri Operations Co. v. Cook*, 353 S.W.3d 14, 18 (Mo.App. W.D. 2011).

The Commission made specific findings interpreting these provisions:

Applying the plain language of the foregoing statutory provisions (which we must strictly construe by virtue of § 287.800.1 RSMo) we cannot impose the "unequal exposure" requirement found in § 287.020.3 to this claim, because the foregoing language contains no such requirement. We note that the legislature amended § 287.067.2 in 2005 to remove language requiring that an occupational disease "meet the requirements of an injury which is compensable as provided in subsections 2 and 3 of section 287.020," as well as language providing that "[a]n occupational disease is not compensable merely because work was a triggering or precipitating factor." The obvious intent and effect of this amendment is clear: in evaluating claims of injury by occupational disease, we must no longer refer to the criteria for a compensable injury by accident under §§ 287.020.2 and 287.020.3.

Accordingly, we conclude that the recent cases discussing the "unequal exposure" requirement under § 287.020.3, e.g., *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504 (Mo. 2012), and *Miller v. Mo. Highway & Transp. Comm'n*, 287 S.W.3d 671 (Mo. 2009), are not applicable to this claim alleging an injury by occupational disease. Instead, following the 2005 amendments to Chapter 287, it is sufficient for employee to demonstrate that the disease he suffered is not an "ordinary disease of life to which the general public is exposed outside of the employment."

By all accounts, the Mycobacterium avium complex (MAC) in employee's lungs was not an "ordinary disease of life." Rather, the medical experts agree it is an extremely rare disease that is typically only seen in individuals with compromised immune systems. As a result, we conclude that employee's MAC qualifies as an "occupational disease" under the law, and is compensable if employee is able to prove the other requisite elements, namely that the disease (1) had its origin in a risk connected with the employment; (2) flowed from that source as a rational consequence; and (3) that employee's occupational exposure was the prevailing factor in causing both the resulting medical condition and disability.

We have carefully reviewed the medical opinions relevant to these factual issues[.] . . . [T]he administrative law judge capably sorted through the conflicting expert testimony, and we discern no need to disturb his well-reasoned analysis.

We agree with the Commission's well-reasoned discussion on these matters. The legislature's 2005 amendment to section 287.067.2 removed language requiring that an occupational disease "meet[] the requirements of an injury which is compensable as provided in

12

subsections 2 and 3 of section 287.020[,]" as well as language providing that "[a]n occupational disease is not compensable merely because work was a triggering or precipitating factor." The legislature's obvious intent was to, in evaluating occupational disease, remove from consideration the criteria for a compensable injury by accident under sections 287.020.2 and 287.020.3. The other districts of this Court that have examined this issue have reached the same conclusion. *See KCP & L*, 353 S.W.3d at 24, *Amesquita v. Gilster-Mary Lee Corp*, 408 S.W.3d 293 (Mo.App. E.D. 2013).

The Commission did not misinterpret or misconstrue the law in its application of section 287.067. *See* section 287.495.1. Point I is denied.

### *Point II: Award Supported by Competent and Substantial Evidence*

In its second point, Employer argues:

The Labor and Industrial Relations Commission erred in finding that the employee's injury arose out of and in the course of his employment because it is contrary to the requirements of a compensable injury defined under §287.020, R.S.Mo., was not supported by competent and substantial evidence and was against the overwhelming weight of the evidence, in that §287.020, R.S.Mo., states that an injury is only compensable if it arises out of and in the course of employment and the employee's duties as an investigator never required his presence on employer's roof nor did the employer receive any benefit from the employee retreating from his job to the roof to be alone and smoke ten times per day.

The dictates of *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App. S.D. 2010), apply in the workers' compensation context of determining whether an award is contrary to the overwhelming weight of the evidence. *Jordan v. USF Holland Motor Freight, Inc.*, 383 S.W.3d 93 (Mo.App. S.D. 2012). Like here, the appellant in *Jordan*, challenged the award of the Commission under subsection 4 of section 287.495.1. *Id.* at 95. We indicated in *Jordan* that:

Successful "against the weight" challenges, by their nature, involve four steps:

1. Identify a factual proposition needed to sustain the result;

2. Marshal all record evidence supporting that proposition;

3. Marshal contrary evidence of record, subject to the factfinder's credibility determinations, explicit or implicit; and

4. Prove, in light of the whole record, that the step 2 evidence and its reasonable inferences are so non-probative that no reasonable mind could believe the proposition.

*Id.*

We noted that:

*Houston* [*v. Crider*] and its progeny, not being workers compensation cases, involved "against the weight" claims. *Hampton [v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003),] speaks in terms of "overwhelming weight," which may reflect a difference in degree, but not in analysis.

*Jordan*, 383 S.W.3d at 95 n.3.

Here, Employer wholly fails to follow the mandatory analytical sequence set forth by *Houston*. 317 S.W.3d at 187. Such a failure renders Employer's argument analytically useless. Nevertheless, even if we were to evaluate Employer's claim, it would still fail on the merits because the Commission's award was not against the overwhelming weight of the evidence.

We must construe the Workers' Compensation Law as amended in 2005—in so doing, we adhere to the general rules of statutory interpretation. *Amesquita*, 408 S.W.3d at 299. "This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Peters v. Wady Industries, Inc.*, 489 S.W.3d 784, 789 (Mo. banc 2016) (internal quotation and citation omitted). "If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then this Court is bound by that intent and cannot resort to any statutory construction in interpreting the

14

statute." *Id.* (internal quotations and citations omitted). Pursuant to section 287.800, we must strictly construe the provisions of Chapter 287.

Occupational diseases are acquired *over time*, not injuries caused by a specific event during a single work shift. *Young v. Boone Elec. Coop.*, 462 S.W.3d 783, 796 (Mo.App. S.D. 2015).

In *KCP & L*, the Western District scrutinized the amendments to section 287.067, which define the standards for compensability of occupational disease. The court noted that the legislature eliminated the cross-reference between section 287.067 and section 287.020:

> Prior to the 2005 amendments, § 287.067.2, RSMo 2000 provided:
>
> An occupational disease is compensable if it is clearly work related *and meets the requirements of an injury which is compensable as provided in subsections 2 and 3 of section 287.020.* An occupational disease is not compensable merely because work was a triggering or precipitating factor.

*KCP & L*, 353 S.W.3d at 24 (emphasis in original.)

> The 2005 amendments rewrote this provision, so that it now reads:
>
> An injury by occupational disease is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability. The "prevailing factor" is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability. Ordinary, gradual deterioration, or progressive degeneration of the body caused by aging or by the normal activities of day-to-day living shall not be compensable.

*Id.*

The *KCP & L* court explained that the elimination of the cross-reference to section 287.020 resulted in a stand-alone compensability standard for occupational disease claims in section 287.067, independent of section 287.020. *Id.* at 24-25. The court reasoned that the creation of an independent compensation scheme for occupational disease provided further evidence of the legislature's intent to remove occupational disease from the narrow definition of "accident." *Id.* Accordingly, the Western District concluded that occupational disease is not an "accident" within

15

the meaning of Chapter 287 and, therefore, the exclusivity provision for accidental injuries or death does not apply to claims for injuries by occupational disease. *Id.* at 29-30.

In 2013, the Eastern District also took up the same issue in *Amesquita*, 408 S.W.3d at 299, reaching the same conclusion as the court in *KCP & L*.

Employer's argument in Point II is premised on the applicability of section 287.020, rather than section 287.067, which governs claims of occupational disease. As the ALJ and the Commission correctly found, under the strict construction required by section 287.800, the unequal exposure requirement for injury[8] is not part of the occupational disease requirement.

The second part of Employer's argument requires us to determine whether the Commission erred in finding that Lankford was exposed to MAI/MAC during the course and scope of his employment.

Lankford was employed as an investigator in the Employer's prosecutor's office. When Lankford began work at the prosecutor's office, he smoked in the area in the basement provided by Employer. He then began going up on the roof at the suggestion of an assistant prosecutor. After that, he preferred the roof because it was quiet and he could think about the case he was working on. The roof contained a substantial amount of pigeon droppings, owing to the presence of the birds on the roof. The droppings caused a bacterial infection in Lankford's lungs, for which he brought his claim.

The ALJ's Award, as adopted by the Commission, analyzed the issue as follows:

It is uncontradicted that [Lankford] was exposed to pigeons and pigeon droppings during the course of his employment. He took smoke breaks, ten times a day, on the roof of the Newton County Courthouse. Both [Lankford and his wife] described that site as one with numerous pigeons and pigeon droppings. Also, during his smoke breaks, [Lankford] discussed with co-employees work activities. His supervisors, the prosecutors, would also discuss cases with him during such smoke

---

[8] *See* ***Johme v. St. John's Mercy Healthcare***, 366 S.W.3d 504 (Mo. banc 2012), and ***Miller v. Mo. Highway & Transp. Comm'n***, 287 S.W.3d 671 (Mo. banc 2009).

breaks. He so testified in his deposition, and also provided a similar history to Dr. Parmet. Mrs. Lankford also described observing [Lankford]'s supervisors discussing work issues with him during the smoke breaks on the roof of the courthouse. That uncontradicted evidence clearly establishes that [Lankford]'s exposure to the pigeons and pigeon droppings arose out of and in the course of his employment with Employer.

There is some disagreement among the medical experts as to what medical conditions [Lankford] contracted. Dr. Parmet opined that [Lankford] had contracted both Crypto and MAI. However, Dr. Jost and Dr. Hofmann opined that [Lankford] did not suffer from Crypto. However, both doctors agreed that [Lankford] suffered from MAI. Moreover, the experts agreed that the lobectomy, which [Lankford] underwent in December 2007, was necessary to treat the MAI. As opined by Dr. Parmet, [Lankford] suffered a disabling stroke as a result of that surgical procedure.

Dr. Parmet opined that the MAI from which [Lankfo1d] suffered arose from his exposure to pigeon droppings during the course of his employment with Employer. Dr. Parmet opined that such exposure was the prevailing factor in causing the MAI. Although Dr. Jost and Dr. Hofmann essentially testified that they could not pinpoint the site of [Lankford]'s exposure to MAI, they acknowledged that it was possible that he had contracted such condition because of his employment at Employer. They both testified that it was possible he was exposed to the risk of contracting MAI during his employment with Employer.

Dr. Jost and Dr. Hofmann placed great emphasis on [Lankford]'s longstanding history of chronic obstructive pulmonary disease ("COPD"). Dr. Parmet also discussed that condition. However, as noted above, the doctors agreed that the condition for which [Lankford] underwent a lobectomy in December 2007 was the MAI and not COPD.

Moreover, Mrs. Lankford testified that [Lankford] was not exposed to pigeons or pigeon droppings outside of work to the extent he was so exposed during his employment with Newton County. A claimant does not have the burden of proof in an occupational disease case such as this to pinpoint the specific exposure *Smith v[.] Capital Region Medical Center*, 412 S.W.[3d] 252 (Mo. App. 2013). The totality of the evidence clearly establishes a probability that [Lankford]'s occupational activities at Employer caused the MAI. It is clear that he experienced a greater risk of exposure to contracting MAI during his employment with Employer than in his non-work activities. I find Dr. Parmet's opinion regarding exposure and causation to be more persuasive than the opinions of Dr. Jost and Dr. Hofmann.

. . . .

17

Consequently, I find and conclude that [Lankford] contracted an occupational disease, MAI, as a result of his exposure to pigeon droppings during the course and scope of his employment with Employer and that such exposure was the prevailing factor in causing both his condition and disability that ultimately led to his stroke which rendered him permanently and totally disabled.

These conclusions are not against the overwhelming weight of the evidence. The Commission did not err in finding that Lankford's injury arose out of and in the course of his employment. Point II is denied.

### Point III: The Commission Was Free to Believe Dr. Parmet

In its third point, Employer argues as follows:

The Labor and Industrial Relations Commission erred in finding the employee suffered an injury by occupational disease because such finding is contrary to §287.067, R.S.Mo., that states ordinary diseases of life to which the general public is exposed outside of the employment are not compensable; is contrary to §287.020, R.S.Mo., that does not allow compensation where work was a triggering or precipitating factor and not the prevailing factor, and also requires that the injury come from a risk that the employee would not be equally exposed to outside of employment in normal non-employment life; and the Commission's conclusion and finding of a compensable injury by occupational disease is not supported by competent and substantial evidence and is against the overwhelming weight of the evidence in that every doctor agrees that MAI/MAC was the employee's only pathogen, that MAI/MAC is a widespread common organism that is present throughout the environment in water, soil, dust and even the tobacco the employee smoked over ten times per day such that it is an ordinary disease of life that the employee was at least equally exposed to in normal non-employment life; and there is no evidence that MAI/MAC was even present on the roof in the pigeon droppings or that there was an increased risk where the only doctor to relate the condition to pigeon droppings did so based on the incorrect assumption that the roof was covered and pigeon droppings piled up when in fact the roof was not covered and any pigeon droppings would have washed away.

Point III, like Points I and II, erroneously presumes the applicability of section 287.020, which, as we have found, does not apply to an occupational disease such as that suffered by Lankford. Further, the argument in Point III fails to follow the mandatory analytical sequence set forth in *Houston*, 317 S.W.3d at 187. *See Jordan*, 383 S.W.3d at 95. Such a failure renders

18

Employer's argument analytically useless. Even if these defects were not present, Employer's argument would fail on the merits.

Employer's argument is essentially that the Commission should have believed the testimony of Dr. Hoffman and Dr. Jost, instead of believing the testimony of Dr. Parmet.

However, "we do not reweigh the evidence; the Commission is the judge of the weight to be given to conflicting evidence and the credibility of the witnesses." *Young*, 462 S.W.3d at 788 (internal quotation and citation omitted).

The Commission was entitled to believe Dr. Parmet, and to disbelieve Dr. Hoffman and Dr. Jost. Employer's argument incorrectly asserts that Dr. Parmet ultimately concluded that Lankford did not suffer from Crypto. In his report of June 11, 2014, Dr. Parmet stated that his previously expressed opinions in his report of August 11, 2008, "are unchanged, although I do note Dr. Jost's comments regarding [Crypto]." Moreover, in a report of July 15, 2011, Dr. Esquerra did not state that Lankford never suffered from Crypto. As Dr. Esquerra noted, "The most likely route of acquiring the [Crypto] is through inhalation. It is my understanding that [Lankford] has worked at the sheriff's department. It is possible that his job at the Sheriff's Department may have put him at risk of contracting the [Crypto] infection."

Dr. Parmet initially, and ultimately, opined that Lankford also suffered from MAI/MAC. As Dr. Parmet noted in his report of June 11, 2014, "the . . . (MAC) infection clearly was present. The subsequent complications and ultimate demise of [Lankford] stems from the evaluation of the fungal infection and biopsy, which resulted in a complication." As Dr. Parmet concluded, the biopsy for the MAI/MAC infection and a complication of that biopsy resulted in Lankford's permanent and total disability. However, the evidence does not show that Dr. Parmet changed his opinion regarding the presence of the Crypto infection.

19

Employer also asserts that there was no substantial and competent evidence because Dr. Parmet premised his conclusions on the errant belief that the roof was covered in dried accumulations of pigeon droppings. Dr. Parmet testified he understood that part of the roof was covered, and part of the roof was exposed. He also testified that some of the pigeon droppings would have been washed away by rain. Moreover, Mrs. Lankford testified that she visited Lankford on the rooftop one-hundred-to-one-hundred-twenty times over the years. She described observing pigeon and pigeon droppings on the roof, fresh and dry, each time she visited. This was competent and substantial evidence to support the Commission's decision, and the decision was not against the overwhelming weight of the evidence. Point III is denied.

The Final Award of the Commission is affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

GARY W. LYNCH, P.J. - CONCURS

DANIEL E. SCOTT, J. – CONCURS IN PRINCIPAL OPINION AND FILES CONCURRING OPINION

20



# Missouri Court of Appeals

## Southern District

### Division Two

TERRY LANKFORD, DECEASED,      )
                                     )
         Employee,          )
                                     )
CAROL LANKFORD, WIDOW,      )     No. SD34269
                                     )
         Dependent/Respondent,  )
                                     )
    vs.                      )
                                     )
NEWTON COUNTY,             )
                                     )
         Employer/Appellant.    )

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### **CONCURRING OPINION**

This case illustrates our limited review in workers compensation – absent legal error, fraud, or unauthorized Commission action, we check for factual and evidentiary support of the award per § 287.495 and ***Hampton v. Big Boy Steel Erection***, 121 S.W.3d 220, 222-23 (Mo. banc 2003). We rarely care how the Commission decided a case except in the few respects § 287.495 allows us to grant relief. I concur.

DANIEL E. SCOTT – CONCURRING OPINION AUTHOR