Brooksie M. HAWKINS, Appellant,

v.

EMERSON ELECTRIC COMPANY, Respondent.

No. 13479.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 24, 1984.

Richard D. Crites, Springfield, for appellant.

James E. Curry, Ava, for respondent.

CROW, Judge.

Brooksie M. Hawkins ("claimant") appeals from a final award of the Labor and Industrial Relations Commission ("Commission"), § 287.480, RSMo 1978, affirming an award of an administrative law judge ("judge"), § 287.460, RSMo 1978, of the Division of Workers' Compensation.

Claimant sought benefits under chapter 287, RSMo 1978, as amended (now "The Workers' Compensation Law," § 287.010, RSMo 1978, amended by Laws 1980, p. 361).

The judge found that although claimant sustained an injury arising out of and in the course of her employment, she did not incur any permanent partial disability as a result, nor did she meet her burden of proof regarding any temporary total disability. The judge also found that the employer was not given the opportunity to provide claimant any medical treatment and, accordingly, claimant's medical expenses of $1,546.19, though reasonable and

necessary, were her own responsibility. On these findings, the judge denied compensation.

The Commission held that the judge's rulings were supported by competent and substantial evidence, and were in accordance with law. Consequently, the Commission awarded no compensation.

Claimant maintains she is entitled to compensation for permanent partial disability, temporary total disability and medical expenses.

The date of the injury was June 11, 1981. Claimant testified she lost her balance and "cricked" her back when a 35-pound motor she was handling on an assembly line got "hung" in a machine. According to appellant, she heard something "pop" in her back and felt pain "in my lower part of my back into my left leg." We identify this incident hereafter as the "accident."[1]

On the issue of permanent partial disability, the judge made this finding, adopted by the Commission:

"It is my opinion that as a result of the incident in question, the employee did not sustain any permanent partial disability. The record is replete with medical records of the employee for prior treatment of various and sundry maladies and Employee's complaints do not appear to me to be substantially changed when considering her complaints prior to the incident in question and subsequent to the incident in question."

Claimant, in her first point, insists this finding is erroneous in that it is not supported by any evidence. To decide the point, we must, of necessity, summarize the medical evidence regarding claimant's back.

As best we can deduce from the records of Dennis N. Morrison, a doctor of osteopathy, claimant saw him on 24 occasions during the period from July 24, 1979, until July 9, 1980. While most of those instances are irrelevant to the dispute here, the following pertinent entries appear in Morrison's records.

"8/7/79 ... her back was bothering her.... Tenderness in thoracic and lumbar area, bilaterally. DIAGNOSIS: ... Musculoskeletal strain....

2/5/80 ... her back is bothering her.... DIAGNOSIS: Thoracic strain ....

4/29/80 ... Dr. Wetzel saw the patient today and thought she had a lower lumbar osteopathic lesion with sacroiliac instability. It is believed due to the patient's occupation of procedures with lifting and stooping all day long that this is the cause.

6/16/80 ... In today saying her lower back is bothering her. She is having problems with this... PHYSICAL EXAM: Revealed lumbar tenderness bilaterally ... DIAGNOSIS: Lumbar strain. PLAN: She received OMT from the cervical to lumbar vertebrae with excellent results in all areas. She will return on Thursday for repeat OMT of the lower back and will try to rehabilitate the lower back so she will not have the problems.

6/19/80 ... She also says her back hurts her. PHYSICAL EXAM: ... Lumbar area is tender to palpation. DIAGNOSIS: Lumbar strain ... PLAN: She was given OMT to the thoracic and lumbar area with excellent results.

6/26/80 ... She is still having back pain. PHYSICAL EXAM: Revealed tenderness in the lumbar area....

7/9/80 ... She has low back pain also ... PHYSICAL EXAMINATION: Revealed low back tenderness...."

As revealed by Morrison's entry of April 29, 1980, claimant was seen at that time by L.E. Wetzel, another doctor of osteopathy. This occurred while claimant was hospitalized at Springfield General Osteopathic Hospital. A report by Wetzel includes the following:

---

1. For the prevailing judicial construction of the statutory definition of "accident" in a workers' compensation case see *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983).

"Spinal examination reveals severe trigger points involving the superior portions of the right and left posterior sacroiliac ligaments along with the iliolumbar ligaments on both sides. She also complains of point tenderness of intraspinous ligaments of all lumbar vertebrae. It was also found that when hand pressure was applied to the lumbar area which was causing the spine to go into slight extension the patient could feel pain radiating down the legs in the same area that she has been previously complaining of.... DIAGNOSIS: Acute sprain of the posterior right and left sacroiliac ligaments, the right and left iliolumbar ligaments and the intraspinous ligaments of all lumbar vertebrae. RECOMMENDATIONS: Osteopathic spinal manipulation and sclerotherapy of the involved trigger points and changing the patient's occupation so that she will not have to flex and twist at the same time."

Morrison and Wetzel were not the only physicians who saw claimant prior to the accident. A.A. Helmich, a chiropractic physician, saw her March 24, 1980 (a month before Wetzel), at which time she was complaining of "lumbar pains—small of the back towards the dorsal area." Specifically, Helmich identified the problem area as the "12th thoracic or the third lumbar—the small of the back." Helmich gave claimant 11 treatments, the last one on May 9, 1980.

Helmich treated claimant "intermittently" thereafter. The last treatment claimant received from Helmich before the accident was May 22, 1981. Helmich explained, "She was taking treatments about every three weeks at that time." Then, this:

"Q. Now, those treatments consisted of manipulating the spine; is that correct?

A. Right.

Q. In the lumbar and thoracic areas.

A. Yes."

On June 12, 1981, the day after the accident, claimant went to see Helmich, complaining of pain in her lower back, radiating down both legs. X-rays revealed "no fractures or anything like that." Helmich found severe spasms on the left side of claimant's "third, fourth and fifth lumbar in the sacral area," and claimant reported pain on pressure points in the sacral area. Asked whether this was the same area he had treated before, Helmich responded, "No, this is below the area I treated her before. Before I treated—in what we call, practically speaking, was the subluxation of the second and third lumbar."

In response to claimant's symptoms of June 12, 1981, Helmich gave claimant a series of treatments using high voltage with ultrasound on the left sacral area, and manipulative therapy on the sacral area and the lower lumbar area. These treatments—three a week—continued until July 31, 1981, when Helmich recommended that claimant see a specialist because she was not responding.

Claimant went to Marion L. Wolf, a doctor of medicine, on September 17, 1981. The record of that visit indicates X-rays were "negative." Wolf's impression was "herniated nucleus pulposus."

A week later, on September 24, 1981, claimant was seen by John F. Ferguson, a board certified neurosurgeon. Claimant, according to Ferguson, said she had never had any lower back problems before the accident. Ferguson found claimant had normal reflexes at the ankles and knees, normal motor strength in all of the motor roots in her lower extremities, normal sensory functions and normal lordosis. Claimant had limitation of motion on forward bending of 45 degrees, but Ferguson noted no muscle spasms. Ferguson examined a myelogram taken by another physician, which "showed a small extradural defect at the L–4–5 level on the left side." Lumbosacral spine X-rays were normal.

Wolf saw claimant again October 12, 1981. His impression on that occasion was "low back pain," for which he recommended "conservative treatment." Thereafter, Wolf saw claimant three times: November 16, 1981, December 14, 1981, and January 15, 1982. Wolf's record on the latter date shows:

"Patient with low back pain and left leg pain, she is here today primarily to see if she could be off work for another year or two secondary to her low back pain. I feel that that is probably not reasonable that she should seek another type of work if necessary but that she should return to work. She was given a slip to return to work in one month and return prn."

Claimant returned to Ferguson in February, 1982, still complaining of low back pain and left leg pain. Because of the persistence of her complaints, Ferguson felt it would be appropriate to try a series of "caudal blocks." Claimant was admitted to St. John's Regional Health Center in Springfield on March 17, 1982, for that treatment, together with a repeat set of diagnostic studies.

A lumbar myelogram on March 30, 1982, was, in Ferguson's opinion, "normal with no evidence of any extradural defect at the L–4–5 level." Claimant had a normal neurological examination, and a "CT scan" showed "absolutely no abnormalities."

Ferguson, in consultation with Wolf and four other doctors, reached a diagnosis of "for lack of anything better to call it— acute and chronic lumbosacral strain." Asked whether he could find any basis for claimant's complaint of pain, Ferguson responded, "No, I could not document any specific basis for the pain that she complained of." Questioned specifically about claimant's gluteus maximus muscle, Ferguson replied that he examined it and found no abnormality. Then, this:

"Q. In your opinion, Doctor, based on reasonable medical certainty, did she have any disability when you last saw her—in the back area?

A. Based on my lack of findings and based on the lack of findings as reported by other physicians, I would have to say no disability at the present." [2]

During the period that claimant was seeing Wolf and Ferguson (August, 1981, through March, 1982), she continued to receive treatment from Helmich. Helmich treated claimant three times in August, twice in September, once in November, twice in December, once in January, and three times in February.

Claimant went to David M. Baker, a doctor of medicine, on April 26, 1982. His examination of claimant revealed tenderness along the iliosacral insertion of the gluteus maximus muscle. Claimant had no tenderness or any abnormality in the low back; the lumbosacral joint was normal, as was the sacroiliac joint. Baker found no suggestion of nerve root problem and no abnormality of the lower extremities. He made a diagnosis of post-traumatic fibrositis of the gluteus muscle, left side. Asked to assume that the injury of June 11, 1981, was the only injury claimant ever had to her back, Baker expressed the opinion that the condition he diagnosed was "directly related" to that injury.

Informed of the diagnosis by Wetzel in April of 1980, Baker testified that what Wetzel described was much more extensive than he (Baker) found. According to Baker, the only place where he and Wetzel found a common injury was the sacroiliac joint ligament sprain. Baker explained that insertion of the gluteus crosses the sacroiliac joint at one point, and in this particular area the injuries had a common point.

Baker saw claimant again December 7, 1982, finding tenderness in the same area, but less severe. His diagnosis remained the same. Baker recommended that claimant go to Helmich for physical therapy.

On December 22, 1982, Helmich began therapy on claimant's gluteus maximus muscle, employing ultrasound, massage and high voltage stimulation. Claimant received three treatments per week from Helmich until February 7, 1983, and two treatments per week thereafter until the hearing on March 2, 1983.

At the hearing, claimant presented testimony from Baker that she had permanent disability of 15 to 20 per cent of the body as a whole.[3]

2. Ferguson's testimony was presented by a deposition taken February 18, 1983.

3. Baker's testimony was presented by a deposition taken January 13, 1983.

The foregoing medical summary is, of course, only a sampling of the extensive medical evidence presented to the judge. Though abridged herein, all medical evidence has been carefully studied.

Claimant's argument, as we understand it, is that her complaints prior to June 11, 1981, pertained to a different part of her back than her complaints thereafter. Claimant points to Helmich's testimony that in his examinations prior to June 11, 1981, he found no evidence of a condition similar to what he found after that date. Claimant says the only evidence of any prior condition similar to that which arose after the accident is Wetzel's diagnosis in April, 1980. Claimant asserts that Baker attributed her back problems to post-traumatic fibrositis of the left gluteus maximus muscle, a condition that no one diagnosed prior to June 11, 1981. Consequently, argues claimant, there was no evidence to support the finding on which the denial of compensation for permanent partial disability was based.

■ Inasmuch as the claim arose after August 13, 1980, our review is governed by § 287.495, RSMo Cum.Supp.1983, Laws 1980, p. 374–75. Paragraph 1 of that section provides, in pertinent part:

"Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award."

Additionally, we note that it was claimant's burden to prove not only that an accident occurred and that it resulted in injury, but also that a disability resulted, and the extent of such disability. *Griggs v. A.B. Chance Co.*, 503 S.W.2d 697, 703 [1, 2] (Mo.App.1973).

■ We agree that the testimony of Baker and Helmich supports claimant's case. We cannot, however, overlook Wetzel's diagnosis in April, 1980, nor can we disregard Ferguson's conclusion, based on extensive medical tests and consultation with Wolf and four other doctors, that claimant has no specific basis for the pain of which she complains and that she had no disability when he last saw her in 1982. Even though the Commission found that claimant received a work-related injury on June 11, 1981, it does not follow that she proved that her present condition, whatever it be, resulted therefrom. The Commission was not obliged to believe Baker, Helmich, or any other witness. The Commission is charged with the responsibility of passing upon the credibility of all witnesses, and it may disbelieve testimony of a witness though no contradictory or impeaching evidence is introduced. *Blissenbach v. General Motors Assembly Division*, 650 S.W.2d 8, 11[5] (Mo.App.1983). Whether the accident caused claimant permanent partial disability depended upon which medical evidence was believed. When medical theories conflict, deciding which to accept is an issue peculiarly for the determination of the Commission. *Rose v. Ozark Pride Agribusiness, Inc.*, 510 S.W.2d 500, 501–02[5] (Mo.App.1974).

■ We reject claimant's contention that the Commission's denial of compensation for permanent partial disability is not supported by sufficient competent evidence.

On the issue of temporary total disability, the judge made this finding, adopted by the Commission:

"The record is silent in regard to any medical testimony as to whether or not the employee was or was not able to perform duties during her time absent from work and therefore, it is my opinion that she did not meet her burden of proof in regard to any claims she might have for healing period."

■ Claimant asserts the Commission erred in failing to award compensation for temporary total disability for a 52-week healing period, in that the Commission "failed to consider the substantial and competent evidence of such disability." There was, according to claimant, uncontroverted testimony that she had an excuse from Helmich to be relieved from her duties at work after the accident.

The only evidence in the record supporting this assertion is claimant's own testimony that Helmich gave her an excuse to be off work and that she took it to her employer's office and "gave it to the office lady."

Helmich was not asked about excusing claimant from work, and he volunteered nothing on that subject.

Pat Meader, a clerk in the employer's office who processes insurance claims, testified that claimant handed her a note from Helmich on or about June 12, 1981. When the employer's attorney asked about the nature of the note, claimant's attorney objected on the ground that the best evidence was the note. The employer's attorney withdrew the question. The note was never produced, and the only evidence regarding its content, apart from claimant's testimony, was Ms. Meader's testimony on cross-examination that the note said claimant "needed to miss work."

Ms. Meader testified that the day before claimant produced the note, claimant had reported that she (claimant) had to leave work and go to the doctor because she thought she had a kidney infection. Ms. Meader recalled that on the day claimant appeared with the note, claimant said she had been thinking it over and had decided that she had hurt her back at work.

Total disability is defined by § 287.020.7, RSMo 1978, as amended by Laws 1980, p. 361:

"The term 'total disability' as used in this chapter shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident."

No physician expressed the opinion that claimant, as a result of the accident, was incapacitated to that degree. Although claimant's testimony might arguably support such a finding, the Commission was not required to accept claimant's testimony as true. *Kite v. Polsky Motors, Inc.*, 614 S.W.2d 294, 299[1] (Mo.App.1981).

Claimant's contention that the Commission erred in awarding no compensation for temporary total disability is denied.

Regarding claimant's medical expenses, the judge made this finding, adopted by the Commission:

"Although the employee incurred $1,546.19 in reasonable and necessary medical expenses in regard to the treatment of her injury, the employer was not given any opportunity to provide the treatment necessary and accordingly, it is my opinion that the employee secured this treatment on her own and therefore, she is responsible for these expenses."

Pertinent to this finding, claimant testified that she did not report the accident to her employer on the day it happened because she "didn't think it was that serious." However, explained claimant, the pain kept her awake that night, so the next day (June 12, 1981) she advised her supervisor. Claimant's testimony:

"Q. And can you tell us what you have told him?

A. I told him that I hurt my back yesterday, that I need to go to the doctor.

Q. What did he say to you?

A. He says if you think you need to go, go.

Q. Okay. Did he ask you how you had hurt your back?

A. I don't recall, no.

Q. Did you tell him how you had hurt your back?

A. No.

Q. Why not?

A. Well, I don't have an answer for that.

Q. Okay and what doctor did you go to?

A. Dr. Helmich.

Q. And was that on the 12th?

A. Yes."

The supervisor testified:

"A. Brooksie came to me and she told me that she didn't feel like working. She said, 'J.C.' ... she said, 'I didn't get any sleep last night.' ... She had been in pain and I asked Brooksie, you know, what the problem was. I asked her if it was work-related and she said that she thought she had a kidney infection and I briefly counseled Brooksie about her attendance. I told her she needed to work if she felt like it because she had had an attendance problem. She said she ... if she didn't feel like working, she could go home.

Q. Did she say anything to you in that conversation about having an accident sometime on the day before?

A. No, she didn't."

The testimony of claimant and Ms. Meader regarding claimant's departure from work to see Helmich on June 12, 1981, and the note claimant subsequently brought back from Helmich, has already been recounted.

Later, another relevant event took place. Ms. Meader testified that on or about August 25, 1981, claimant submitted an "insurance claim form" for payment of an amount due James M. McCarthy, a chiropractic physician, for treatment on six dates between August 12 and 21, 1981. On the portion of the form to be completed by the employee, the nature of the illness was shown as "Back," and a question whether the claim was based on an accident was answered "No." Claimant admitted signing the form, but denied making the "No" answer.

Ms. Meader contradicted claimant, testifying that the employee's portion of the form was completed when claimant submitted it. Ms. Meader added that employees who are hurt on the job do not submit that type claim. Instead, an accident report is made "and then it's a workmen's comp claim."

It is also noteworthy that on some unidentified date after the accident, claimant

resumed work and remained about a week. She then left work and did not return. Her testimony:

"Q. Did you just not go back to work or what? Or did you tell them you weren't going to come back or what?

A. No, I didn't tell them I wasn't coming back."

Section 287.140.1, RSMo 1978, as amended by Laws 1980, p. 363, provides, in pertinent part:

"In addition to all other compensation, the employee shall receive and the employer shall provide such medical, surgical and hospital treatment, including nursing, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury. *If the employee desires, he shall have the right to select his own physician, surgeon, or other such requirement at his own expense.*" (Emphasis added.)

Claimant insists the Commission erred in finding that the employer was not given any opportunity to provide treatment. Citing *Hendricks v. Motor Freight Corp.*, 570 S.W.2d 702 (Mo.App.1978), claimant argues that an employer who fails or refuses to provide necessary medical treatment to an employee who is known by the employer to have sustained a work-related injury, waives the right to choose the treating physician, and the employee may then make his own selection, with the expenses, if reasonable, to be charged to the employer.

Claimant reminds us of Ms. Meader's testimony that claimant, after seeing Helmich on June 12, 1981, said she had hurt her back at work. Additionally, claimant testified that on some date after the accident, she told her employer's personnel manager that she had hurt her back while working. The Commission, evidently on the basis of this testimony, found that the employer had actual notice of the injury, despite the absence of written notice.

The employer, denying liability for claimant's medical expenses, relies on the evidence that claimant initially attributed her

symptoms to a kidney infection and did not disclose the accident. From that point on, argues the employer, claimant sought no medical treatment from it, electing instead to consult Helmich, who had attended her for more than a year before the accident. After several weeks of treatment by Helmich, claimant, on Helmich's recommendation, consulted Wolf. The employer emphasizes that the record is silent as to any request by claimant that the employer provide medical treatment.

■ *Anderson v. Parrish*, 472 S.W.2d 452, 457 (Mo.App.1971), recognizes that an employee has the right to employ his own physician at his own expense, and points out that it is only when the employer has notice that the employee needs treatment, or a demand is made on the employer to furnish medical treatment, and the employer refuses or fails and neglects to provide needed treatment, that the employer is held liable for the medical treatment procured by the employee.

■ In the instant case, claimant concedes she did not report the accident to her employer on the day it occurred, and there is sufficient competent evidence to support a finding that when claimant told her employer that she needed to go to the doctor the following day, claimant said it was because of a kidney infection. There is also sufficient competent evidence to support a finding that at no time after her visit to Helmich on June 12, 1981, did claimant request that her employer provide medical treatment. What claimant did was to submit an insurance claim for payment of McCarthy's charges, which stated that the claim was not based on an accident. Ms. Meader testified that claimant turned in similar claims for other medical bills.

The Commission, on this evidence, could reasonably conclude that claimant chose to obtain treatment from physicians of her own choice, rather than accepting treatment from physicians selected by the employer. In analogous circumstances, employers have been exonerated from liability for the cost of such treatment. *Moore v. International Shoe Co.*, 213 S.W.2d 215 (Mo.App.1948); *Kopolow v. Zavodnick*, 177 S.W.2d 647 (Mo.App.1944).

Mindful that the issue is close, we hold there was sufficient competent evidence to support the Commission's ruling that the employer is not responsible for claimant's medical expenses.

The Commission's award, denying compensation, is affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.