

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| JUSTIN KENT, | ) | No. ED108667 |
| | ) | |
| Appellant, | ) | Appeal from the Labor and Industrial |
| | ) | Relations Commission |
| vs. | ) | |
| | ) | |
| NHC HEALTHCARE AND TREASURER | ) | |
| OF THE STATE OF MISSOURI AS | ) | |
| CUSTODIAN OF THE SECOND INJURY | ) | |
| FUND, | ) | |
| Respondents. | ) | FILED: February 2, 2021 |

## Introduction

Justin Kent ("Kent") appeals from the final award of the Labor and Industrial Relations Commission (the "Commission") ordering Kent's former employer, NHC Healthcare, to pay permanent partial disability ("PPD") benefits in the amount of $44,123.80, but reversing the findings and awards of the administrative law judge (the "ALJ") of permanent total disability ("PTD"), past medical expenses, and temporary total disability ("TTD"), which the ALJ had found in Kent's favor.

Kent raises six points on appeal. In Points One and Two, Kent challenges the Commission's findings and award of no PTD. In Point Three, Kent argues the Commission erred in declining to award him past medical expenses for the medical treatment Kent pursued at his own expense. In Point Four, Kent contends the Commission erred in denying additional TTD benefits because the evidence showed Kent was totally disabled during the time period at issue.

In Points Five and Six, Kent raises evidentiary issues alleging the Commission erred in refusing to admit a report prepared by Dr. Benjamin Crane (the "Crane Report" and "Dr. Crane," respectively) and finding a report prepared by Dr. Alan Morris (the "Morris Report" and "Dr. Morris," respectively) and a report prepared by Dr. David Parks (the "Parks Report" and "Dr. Parks," respectively) were not in evidence.

Because the Commission's factual determinations are consistent with its finding of no PTD and because sufficient competent evidence supported the Commission's award of only PPD benefits, we deny Points One and Two. The record contains no evidence that Kent demanded medical treatment from NHC Healthcare after his termination of employment. Because the Commission reasonably could have found that Kent directed his own medical treatment at his own expense, we deny Point Three. Because sufficient competent evidence supports the Commission's finding that Kent did not suffer from TTD in excess of his original compensation, we deny Point Four. The record shows that Kent did not present his evidentiary arguments concerning the Crane, Morris, and Parks Reports to the Commission. Because Kent did not preserve these evidentiary issues for appellate review, we deny Points Five and Six. Accordingly, we affirm the final award of the Commission.

Factual and Procedural History

**I.      Initiation of the Claim and the ALJ's Findings of Fact**

Because the Commission made express findings of fact and conclusions of law in this matter we review on appeal the Commission's actions and not those of the ALJ. However, we will summarize the ALJ's findings and conclusions to provide context for our review of the Commission's decision. Schlereth v. Aramark Unif. Servs., Inc., 589 S.W.3d 645, 651 (Mo. App. E.D. 2019) (internal citation omitted).

On January 9, 2009, Kent filed a claim for compensation with the Division of Workers'

2

Compensation of the Missouri Department of Labor and Industrial Relations (the "DWC"), alleging that he had been injured in the course of his employment with NHC Healthcare on December 4, 2008. Specifically, Kent alleged that he injured his back lifting a patient. In the "Additional Statements" section of the claim form, Kent wrote "the claimant is in need of . . . additional medical treatment." Kent also filed his claim with the Second Injury Fund (the "Fund"), believing he had a basis for such a claim due to preexisting conditions not relevant to this appeal. The Fund filed its answer on January 22, 2009, and NHC Healthcare filed its answer on February 20, 2009.

Following Kent's amended filings in 2015 and 2018, the ALJ conducted hearings and issued its findings of fact and rulings of law on April 8, 2019. The ALJ reviewed the DWC file but did not enter the DWC file into the record. The ALJ noted the parties' stipulation that on or about December 4, 2008, Kent sustained an accidental injury arising out of and in the course of his employment. The ALJ also noted the parties' stipulation that NHC Healthcare received proper notice of the injury.

The ALJ excluded from evidence the Crane, Morris, and Parks Reports. The ALJ deemed the reports to be inadmissible hearsay because they were prepared to assist Kent with his disability claim and were not contemporaneous medical reports. The ALJ sustained objections to other testimony regarding the contents of the reports, observing that "[a] testifying expert cannot be a mere conduit for another non-testifying expert." In addition, The ALJ found the Crane Report was also inadmissible due to irregularities in the deposition of the custodian of records.

The ALJ made the following findings of fact. On December 4, 2008, Kent was attempting to help a patient who had fallen. As Kent was lifting the patient, he felt and heard a pop in his lower back. Kent told the nurse in charge, wrote a report stating that he felt the pop

3

and pain, then left work before his shift was scheduled to end. Kent began a course of treatment authorized by NHC Healthcare the next day. Kent complained of back pain and tenderness. Kent had no complaints of numbness or tingling. The physician concluded that Kent suffered from low back pain, spina bifida, and unilateral left pars interarticularis defect. Kent received physical therapy, medication, and work restrictions.

NHC Healthcare sent Kent to Dr. Bernard Randolph ("Dr. Randolph") for six visits between December 16, 2008 and March 2, 2009. Dr. Randolph examined Kent and concluded that Kent suffered from pain with movement and palpation, limited range of motion, and some degree of symptom magnification, but showed no radicular symptoms. Dr. Randolph opined that Kent had sustained a lumbar and mild lower thoracic strain with no structural damage and that conservative measures were appropriate for treatment. Dr. Randolph ordered an MRI on January 2, 2009. The MRI indicated that Kent had a mild right paracentral protrusion at L4–L5, which Dr. Randolph found to be consistent with a chronic, degenerative process. Dr. Randolph acknowledged that the work accident may have exacerbated Kent's condition, took Kent off work, and referred Kent for epidural injections. Kent received the epidural injections but reported they were not helpful.

By January 22, 2009, Dr. Randolph opined Kent had mechanical back pain, which was sub-optimally responding to treatment. Dr. Randolph approved Kent to return to work with instructions to watch his posture and perform his home exercises. Kent returned to work in February, and NHC Healthcare provided accommodations for light duty in compliance with Dr. Randolph's restrictions. The following month, Kent presented to Dr. Randolph with low back pain. Dr. Randolph again found no radicular symptoms and also found no sensory deficits. Dr. Randolph found Kent had normal leg strength and reflexes. Dr. Randolph concluded Kent's

complaints were subjective rather than objectively supported and that Kent showed signs of symptom magnification. Dr. Randolph placed Kent at maximum medical improvement ("MMI") on March 2, 2009, and later assigned Kent PPD of no more than one percent.

In March 2009, NHC Healthcare terminated Kent. Kent acknowledged that he had been written up multiple times while on light duty and that he was terminated after he improperly parked in a visitor's parking section. While Kent said he was terminated because of his back pain and treatment, a witness for NHC Healthcare testified that Kent was terminated because he provided untrue and misleading statements in relation to a mandatory investigation arising out of a patient complaint. Kent has not had gainful employment since his termination.

Kent testified he needed additional medical treatment for his work injury, but did not request any such treatment from NHC Healthcare. Kent explained that he thought NHC Healthcare would not assist him. On April 13, 2009, without notifying NHC Healthcare, Kent sought treatment from his own personal care physician, Dr. Parks. Kent complained of persistent lower back pain radiating into his leg. Dr. Parks ordered an MRI, which showed single level mild degenerative changes at L4–L5 with disc herniation.

Dr. Parks referred Kent to Dr. Naseem Shekhani ("Dr. Shekhani"), to whom Kent complained of back pain radiating into his lower extremities with feelings of numbness in his right thigh. In April 2009, Dr. Shekhani diagnosed Kent with herniated disc disease, sciatica, lumbago, and antalgic gait. Dr. Shekhani provided Kent with a selective nerve root block injection, but the injection only provided Kent temporary relief. The record contains no evidence indicating that NHC Healthcare had any advance knowledge of Kent's treatment from Dr. Shekhani.

Dr. Shekhani recommended a surgical consultation, and Kent sought treatment from Dr. Selwyn Picker ("Dr. Picker") in June 2009. Kent complained of persistent lower back pain since December 2008. Dr. Picker noted no radiation of the pain, no lower extremity pain, and no numbness, paresthesia, or weakness in the lower extremities. On at least four occasions, Dr. Picker noted there was no radiation or radicular pain and that the pain was static in Kent's back. There is no evidence NHC Healthcare had advance knowledge of Kent's treatment with Dr. Picker.

Dr. Picker referred Kent to surgeon Dr. Neill Wright ("Dr. Wright"). Dr. Wright diagnosed Kent with a closed fracture of the L4 vertebral body and a lumbar disc degeneration L4–5. Dr. Wright recommended lateral and L4–5 fusion, which Kent did not undergo. There is no evidence NHC Healthcare had advance notice of Kent's treatment from Dr. Wright.

In May 2010, Kent returned to Dr. Parks, complaining of severe lower back pain that radiated into his buttocks and legs and which prevented him from bending, lifting, sitting for prolonged periods, standing, or performing any kind of work. Kent continued seeing Dr. Parks regularly for general health care and treatment related to his work injury.

In September 2010, Kent saw Dr. Daniel Kitchens ("Dr. Kitchens") following a referral from Dr. Parks. Kent again reported that his pain began in December 2008 as a result of his work injury. Dr. Kitchens ordered an MRI which again showed degenerative changes most pronounced at L4–5. Dr. Kitchens performed a right L4–5 microdiscectomy on Kent in September 2010. Following surgery, Kent initially reported great improvement in his radicular pain and no longer reported numbness, tingling, or shooting pain, but by the end of the year Kent's lower back pain had returned with pain and weakness in his right leg. Another MRI

showed epidural fibrosis and post-operative changes at the right L4–5, but no recurrent or new disc herniation.

Dr. Kitchens referred Kent to Dr. Rachel Feinberg ("Dr. Feinberg"). Dr. Feinberg diagnosed Kent with lumbar sacral spondylosis and rectus spondylosis. In February 2011, Dr. Feinberg administered several joint and trigger point injections. Also in early 2011, Kent again self-reported an inability to work to Dr. Parks. In November 2011 and August 2013, Dr. Kitchens examined Kent and opined that Kent would not benefit from further surgery.

Kent then saw Dr. Fangxiang Chen ("Dr. Chen") in March 2014. Dr. Chen observed that Kent had L4–5 degenerative disc disease and performed an L4–5 fusion in September 2014. Kent initially reported improvement, but reported that his back pain had returned the next month. In April 2015, Kent reported to Dr. Parks that the fusion performed by Dr. Chen had improved his back pain by fifty percent and that he was no longer suffering from radiating pain.

After Dr. Chen's treatment, Kent suffered additional injuries unrelated to his 2008 work injury. At some point during 2016, Kent sought medical treatment at the hospital for a sprained ankle. In August 2016, Kent was in a motor vehicle accident and received treatment for associated injuries. In October 2017, Kent fell on his right shoulder while running and reported to the emergency room on two consecutive nights for pain relief. Kent underwent surgery on his right shoulder in March 2018. In June 2018, Kent was involved in another motor vehicle accident.

In February 2018, four months before Kent's automobile accident, Dr. Crane conducted an independent medical examination and prepared a report ("Crane Report 2"). This additional report is separate from the aforementioned Crane Report, and was admitted into evidence by the ALJ. In this Crane Report 2, Dr. Crane diagnosed Kent with spondylosis L4–5, lower back pain,

and non-union lumbar spine. Dr. Crane believed that Kent might be a candidate for a revision fusion operation. Although the ALJ excluded the initial Crane Report from evidence because Dr. Crane was not deposed and the Crane Report was not admitted, the ALJ limited Dr. Crane's evidence to his admissible report.

Kent's medical expert, Dr. Thomas Musich ("Dr. Musich"), conducted independent medical examinations of Kent in June 2013 and September 2015 and issued five reports concerning Kent's condition from June 2013 to December 2018. Dr. Musich testified that he found with a reasonable degree of medical certainty that Kent's workplace accident was a substantial and prevailing factor in Kent's back pain and radicular pain. Dr. Musich concluded that all of Kent's medical bills were customary, usual, and related to the treatment Kent received to cure and relieve the effects of his lower back injury, and that all of Kent's treatments and evaluations referable to his work injury were reasonable and necessary. Dr. Musich determined that, as of September 10, 2015, Kent had a PPD of sixty-five percent referable to his lumbar spine and associated symptoms. Dr. Musich found that Kent had reached MMI and opined that Kent should continue to receive treatment including analgesics and home physical therapy. In his subsequent reports and testimony, Dr. Musich maintained that Kent suffers from PTD as a result of his workplace injury. Dr. Musich testified to Kent's need for future medical treatment, including pain medication costs and a potential revision fusion operation.

Additionally, two vocational experts met with Kent and reviewed his case. James England ("England") testified that Kent lacked the ability to do any sort of work on a consistent day-to-day basis and was not a candidate for retraining. England stated that Kent's inability to work related in part to factors beyond his back injury, such as Kent's personality and poor

8

academic ability. J. Stephen Dolan found that Kent's self-reported anxiety was severe enough to prevent Kent from maintaining employment.

## II.    The ALJ's Conclusions of Law

Regarding past medical expenses, the ALJ found that all the treatment sought by Kent flowed from the work accident. However, because Kent acknowledged that he had not provided notice to NHC Healthcare when he sought treatment from Dr. Parks, Dr. Shekhani, Dr. Picker, and Dr. Wright, the ALJ ruled that such treatment was incurred at Kent's own expense. Notwithstanding the lack of actual notice of Kent's need for medical treatment, the ALJ ruled that NHC Healthcare reasonably could be charged with notice of Kent's need for further medical treatment in January 2010 because the initial case setting at the DWC had occurred in June 2009 and three case settings had occurred by the end of January 2010. The ALJ also accepted Dr. Musich's conclusion that Kent's treatment was reasonable and necessary. The ALJ found Dr. Randolph's contrary conclusion unpersuasive because it was rooted in Dr. Randolph's belief that Kent never suffered radicular symptoms. In total, the ALJ found that NHC Healthcare was liable for $140,030.65 in past medical expenses. The ALJ further found that NHC Healthcare would be responsible for future medical expenses.

Regarding Kent's claim for TTD benefits dating back to early 2009, the ALJ ruled that Kent was entitled to TTD benefits beginning May 12, 2010. The ALJ reasoned that Kent did not testify as to his physical state in 2009 to an adequate level of detail to allow a finding of TTD based upon his testimony alone, and further found no additional evidence that would support an award of TTD dating back to 2009. However, on May 12, 2010, Dr. Parks recorded that Kent's injury prevented him from working. This opinion was echoed by Dr. Musich on June 4, 2013. Kent continued to receive treatment with the hopes of improving his condition.

9

Regarding Kent's claim for PTD benefits, while expressing hesitation due to Kent's young age, the ALJ granted Kent PTD based upon both the medical records introduced at the hearing and the ALJ's observations of Kent's pain cues during testimony. The ALJ found Dr. Randolph's assessment of permanent disability at only five percent (5%) of the body as a whole unpersuasive. Specifically, the ALJ found that the fact that Kent occasionally engaged in activities such as tending bar for his friend did not demonstrate that Kent could perform the duties that would be expected of an employee. The ALJ dated Kent's PTD to October 30, 2014, the date on which Dr. Chen began focusing his treatments on Kent's hip as opposed to his back.

Regarding the Fund's liability, the ALJ held that the Fund was not liable because Kent's disability stemmed solely from the 2009 workplace injury. The ALJ rejected Kent's claim that the Fund was liable due to preexisting conditions such as anxiety.

## III.    The Commission's Modification of the ALJ's Award

NHC Healthcare sought review of the ALJ's findings by the Commission. NHC Healthcare alleged the ALJ erred in finding that Kent suffered from PTD due to the workplace accident, in awarding past medical expenses when there was no demand for treatment and a causal connection was not proven, in awarding future medical treatment, in dating TTD to May 12, 2010, and in finding no Fund liability. The record does not show Kent argued that the ALJ erred in any way.[1]

---

[1] Kent filed a motion to supplement the record on appeal, which we denied, and a motion to reconsider our denial of his motion to supplement the record on appeal, which we took with the case. Neither motion sought to supplement the record with any evidence showing Kent raised allegations of error by the ALJ before the Commission. Instead, both motions sought to supplement the record with the complete file from the DWC, which was not before the Commission. Kent's motion for reconsideration relies upon Rowe v. Se. Mo. Residential Servs., 599 S.W.3d 924 (Mo. App. S.D. 2020), arguing that we must grant his motion because all "relevant papers" must be part of the record on appeal. See id. at 926–28 (internal citation omitted). On the contrary, Rowe holds that documents not properly before the Commission may not be included in the record on appeal. See id. at 927 (noting that anything not filed with the Commission in the matter "should not and cannot be considered" on appeal). Accordingly, we must deny Kent's motion to reconsider our denial of his motion to supplement the record. See id.

Following its review and consideration of the parties' briefs, argument, and the complete record, the Commission entered a Final Award granting compensation to Kent. In modifying the award made by the ALJ, the Commission generally accepted the findings, conclusions, and decisions of the ALJ's Award *to the extent they were not inconsistent with the Commission's own findings, conclusions, decisions, and modifications*. The Commission adopted Dr. Musich's diagnosis that Kent suffered from post-traumatic symptomatic lumbar spondylosis with radicular symptoms. The Commission clarified further that it found no disability resulting from the work injury referable to any psychological conditions or alcoholism.

Notably, the Commission rejected the ALJ's finding that Kent suffered from PTD and, instead, found that Kent suffered from a thirty-five percent (35%) PPD of the body as a whole, referable to the lower back. While the Commission rejected Dr. Randolph's rating of one to five percent (1% - 5%) disability as unreasonably low, the Commission also questioned Dr. Musich's finding of PTD for various reasons. The Commission noted that no treating physician placed permanent restrictions on Kent's ability to return to work and that the physical limitations described in the medical records seemed to be self-imposed by Kent. The Commission also expressed doubt as to Kent's credibility in large part due to Kent's failure to mention multiple accidents that may have exacerbated his condition to his treating physicians. The Commission also had doubts to what extent Dr. Musich's opinion was based on records that were not admitted into evidence and to what degree said records were accurate or reliable. Following its review, the Commission concluded that Kent did not suffer PTD as a result of the workplace injury and noted that "while there is evidence that [Kent] may be permanently and totally disabled, the evidence does not persuade us that it is the disability flowing from the work injury that caused [PTD]." The Commission affirmed the ALJ's conclusion that the Fund was not liable for PTD.

11

Regarding past medical expenses, the Commission rejected the theory of constructive notice adopted by the ALJ. The Commission emphasized that the record contained no evidence that NHC Healthcare denied medical treatment requested by Kent. Further, Kent admitted on the record that he sought medical treatment following his termination without notifying NHC Healthcare. Accordingly, the Commission reversed the ALJ's award of past medical expenses.

The Commission also reversed the ALJ's award of additional TTD benefits. The Commission found that the date of May 12, 2010 used to begin the period of Kent's TTD by the ALJ was based solely on a self-report by Kent which the Commission found to be not credible due to the absence of any reference in the medical records to the multiple other injuries suffered by Kent following his workplace injury and evidence of symptom magnification by Kent. The Commission noted that no treating physicians had imposed permanent work restrictions on Kent, as well as evidence that Kent had worked in some capacity for friends. The Commission found that Kent suffered from TTD only for the brief period following his injury until Dr. Randolph released him back to work and that NHC Healthcare had already compensated Kent for this period of disability. The Commission ordered NHC Healthcare to pay PPD benefits in the amount of $44,123.80 at a weekly rate of $315.17 with any past due compensation bearing interest as provided by law. Kent now appeals.

Points on Appeal

In Point One, Kent contends the Commission erred in denying PTD because the facts found by the Commission supported a finding and award of PTD. In Point Two, Kent alleges the Commission erred in denying PTD and awarding only PPD benefits because there was not sufficient competent evidence in the record to support a finding of less than PTD and that the Commission's award was against the overwhelming weight of the evidence. In Point Three, Kent argues the Commission erred in not awarding past medical expenses because NHC

12

Healthcare admitted the need for continued treatment and NHC Healthcare had actual and constructive knowledge of the need for the medical treatment incurred. In Point Four, Kent contends the Commission erred in denying TTD because the evidence showed Kent was totally disabled during the time period at issue. In Point Five, Kent alleges the Commission erred in refusing to admit the Crane Report because its admission was required by law as part of the complete medical record. In Point Six, Kent argues the Commission erred in finding the Morris and Parks Reports were not in evidence.

Discussion

## I.   Point One—The Commission Did Not Err in Denying an Award for PTD Based on Its Findings of Fact

Kent's first point on appeal challenges the Commission's failure to award him PTD benefits because the facts found by the Commission supported a finding of PTD. Specifically, Kent maintains that the Commission made factual findings showing Kent suffered from PTD and that the Commission's award denying Kent PTD benefits is contrary to the Commission's other findings based on its partial adoption of the ALJ's findings.

### A.   Standard of Review

We will affirm the decision of the Commission unless: "(1) the Commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was not sufficient competent evidence in the record to warrant the making of the award." Annayeva v. SAB of TSD of City of St. Louis, 597 S.W.3d 196, 198 (Mo. banc 2020) (internal quotation omitted); see Section 287.495.1.[2] We review the findings of the Commission, not those of the ALJ. Schlereth, 589 S.W.3d at 651. The Commission's findings of fact are conclusive, and we defer to the Commission's assessment

---

[2] All Section references are to RSMo (2016).

13

of the credibility of witnesses and the weight given to conflicting evidence. Annayeva, 597 S.W.3d at 198 (citing Section 287.495.1; Greer v. SYSCO Food Servs., 475 S.W.3d 655, 664 (Mo. banc 2015)). Challenges alleging that the Commission's award is not supported by the facts found by the Commission under Section 287.495.1(3) can only succeed if the Commission affirmatively found facts contrary to its award, rather than failing to find facts to support its award. Schlereth, 589 S.W.3d at 652 (internal citations omitted).

B.     Analysis

In arguing the Commission's award of no PTD was contrary to its own factual findings, Kent primarily relies on the statement by the Commission that "there is evidence that [Kent] may be permanently and totally disabled[.]" See id. Kent reasons that this statement shows the Commission found that he suffers from PTD. However, Kent's reliance on this statement is misguided because Kent ignores the larger context of the Commission's analysis. While the Commission recognized that "there is evidence that [Kent] *may* be permanently and totally disabled[,]" the Commission expressly rejected a finding that Kent suffered from PTD as a result of the workplace injury. (Emphasis added). We must consider the Commission's complete finding as reflected in the record and not just those words which reflect favorably for Kent's claim. In its entirety, the Commission found "while there is evidence that [Kent] may be permanently and totally disabled, *the evidence does not persuade us that it is the disability flowing from the work injury that caused [PTD]*." (Emphasis added). The Commission clearly reasoned that *even if* Kent suffers from PTD, he failed to demonstrate that his PTD was a result of the workplace injury as opposed to other causes, such as subsequent injuries. See Kuykendall v. Gates Rubber Co., 207 S.W.3d 694, 704 (Mo. App. S.D. 2006) (internal citation omitted) (providing the claimant bears the burden of proving his work injury was the cause of his condition).

14

As further support for his claim that the Commission erred in failing to award him PTD, Kent directed this Court to findings of the ALJ that he contends are inconsistent with the Commission's award. We certainly recognize the incompatibility of the ALJ's findings with the Commission's award and rejection of Kent's claim for PTD. However, a fundamental principle and limitation of our scope of review is that we review only the factual findings of the Commission, not the ALJ. Schlereth, 589 S.W.3d at 651. We must analyze the Commission's findings in relation to the award made by the Commission. Id. at 651–52. Kent seeks to broaden our review of the factual findings made during the administrative proceedings by arguing that the ALJ's findings were adopted by the Commission, and therefore are subject to our review. See Kuykendall, 207 S.W.3d at 702 (internal citation omitted) (providing when "the Commission incorporates the ALJ's award and decisions . . . we consider the findings and conclusions of the Commission as including the ALJ's award" (quotation omitted) (omission in original)). Kent's argument is unavailing because the record plainly shows that the Commission did not fully adopt the ALJ's findings. Instead, the Commission adopted the ALJ's findings only *to the extent they were not inconsistent* with the Commission's own findings. The presence of any inconsistency between the factual findings of the ALJ and the Commission reflect those findings of the ALJ that were not adopted by the Commission and do not constitute affirmative findings of facts justifying reversal under Section 287.495.1(3). See Schlereth, 589 S.W.3d at 652.

Because the Commission did not enter an award contrary to its own affirmative findings of fact, we cannot reverse on the grounds raised in Point One. See id.; Section 287.495.1(3). Point One is denied.

15

**II.** **Point Two—The Commission Did Not Err in Denying an Award for PTD Based on the Sufficient, Competent Evidence in the Record**

In his second point on appeal, Kent again asserts the evidentiary failings of the Commission's award of only PPD benefits and its corresponding denial of PTD. In a manner somewhat analogous to the argument presented in Point One, Kent contends there was not sufficient competent evidence in the record to support an award of anything less than PTD. Kent continues his point by asking this Court to reverse the Commission's decision and enter an award of PTD based upon the overwhelming weight of the evidence. Worded another way, Kent reasons that the record contains sufficient competent evidence to support only an award of PTD, and that any lesser award is simply against the overwhelming weight of the evidence. As support for this point, Kent again argues that the Commission made factual findings that he suffered from PTD. Kent also contends that the Commission erred in determining Kent was not credible, and that the Commission should have found that Kent suffered from PTD after weighing the conflicting medical evidence.

A.     Standard of Review

Our review of this point is limited to determining whether the record contains sufficient competent evidence to support the Commission's award under Section 287.495.1(4). Annayeva, 597 S.W.3d at 198. As with Kent's first point on appeal, we review the factual findings of the Commission, not the ALJ, and we are bound by the Commission's findings of fact, assessments of witness credibility, and the weight the Commission accords to conflicting evidence. See id.; Schlereth, 589 S.W.3d at 651. Importantly, if the evidence allows for two contrary findings, we are bound by the finding reached by the Commission. Thompson v. Treasurer of Mo., 545 S.W.3d 890, 893 (Mo. App. E.D. 2018). Specifically, "[t]he weight afforded to a medical expert's testimony is exclusively within the discretion of the Commission," and where there is

16

disagreement between medical experts "the issue is peculiarly for the Commission's determination." Bond v. Site Line Surveying, 322 S.W.3d 165, 170 (Mo. App. W.D. 2010) (internal citations and quotation omitted). Whether a claimant is permanently and totally disabled is a finding of fact, not law. Archer v. City of Cameron, 460 S.W.3d 370, 376 (Mo. App. W.D. 2015) (internal citation omitted).

Here, Kent maintains not only that there is insufficient evidence to support the Commission's PPD award, but that an award of anything less than PTD is against the overwhelming weight of the evidence. Because Kent frames this point on appeal as a weight of the evidence challenge, he triggers a specific analytical process. We will reverse an award under Section 287.495.1(4) *only* if the appellant follows the *mandatory* process of marshaling all of the evidence in the record favorable to the Commission's finding, marshaling all of the evidence in the record unfavorable to the Commission's finding, subject to the deference to be given to the Commission's assessment of witness credibility, and then showing that the unfavorable evidence so overwhelms the favorable evidence that the Commission's finding is essentially unsupported. Schlereth, 589 S.W.3d at 652 (internal citations omitted). Only in the "rare case" will an appellant successfully meet this burden. Hadley v. Beco Concrete Prods., Inc., 505 S.W.3d 355, 358 (Mo. App. S.D. 2016) (quoting Hampton v. Big Boy Steel Erection, 121 S.W.3d 220, 223 (Mo. banc 2003)) (additional citation omitted).

B.      Analysis

Initially, we note that Kent generally adheres to the mandatory analytical framework for his sufficiency-of-the-evidence challenge. See Schlereth, 589 S.W.3d at 652. Kent identifies the three primary reasons given by the Commission for finding against an award of PTD: (1) no physicians placed permanent restrictions on Kent's ability to return to work; (2) the physical limitations in the medical records seemed to be self-imposed by Kent, who the Commission

17

found to be not credible; and (3) uncertainty as to the extent Dr. Musich's opinion was based on records not admitted into the record and to what degree said records were accurate or reliable. However, Kent fails to meet his burden under Section 287.495.1(4) for the following material reasons.

First, Kent erroneously suggests that the Commission found Kent suffered from PTD, an argument we have already rejected in Point One. Second, although Kent challenges the Commission's assessment of Kent's credibility, this argument must fail because we are bound by the Commission's credibility determinations. See id. at 651–52. Third, Kent similarly fails to acknowledge the Commission's role and authority in weighing medical expert testimony, especially in cases where the expert testimony conflicts, as it did here. See Bond, 322 S.W.3d at 170. Here, the Commission was presented with highly conflicting medical opinions from Dr. Randolph and Dr. Musich. Dr. Randolph assessed a disability rating of only one to five percent (1% - 5%) disability whereas Dr. Musich found Kent suffered from PTD. In light of the extreme variance in these disability ratings and the fact that the Commission found neither medical opinion entirely credible, the Commission weighed the opinions of the experts and ultimately found Kent suffered from thirty-five percent (35%) PPD of the body as a whole, referable to the lower back. Our standard of review requires us to defer to the weight accorded to the varied expert testimony by the Commission. See id. Finally, we note that while Kent consistently posits that the Commission *should have* found Kent suffered from PTD, Kent does not present an argument that the Commission *could not have* reached its contrary conclusion that Kent only suffered from thirty-five percent (35%) PPD from the evidence before it. When the evidence before the Commission allows for more than one finding, we are bound by the finding reached

18

by the Commission.  See Thompson, 545 S.W.3d at 893.  The record simply fails to offer any reason or basis that would allow us to reject the credibility determinations of the Commission.

We are not persuaded that Kent has met his substantial burden of showing that this matter is the "rare case" where the evidence contrary to the Commission's finding so overwhelms the evidence supporting the Commission's finding that the Commission's finding is essentially unsupported and merits reversal under Section 287.495.1(4).  See Schlereth, 589 S.W.3d at 652; Hadley, 505 S.W.3d at 358.  Point Two is denied.

**III.    Point Three—The Commission Did Not Err in Limiting Its Award of Past Medical Expenses**

In his third point on appeal, Kent argues the Commission erred in not awarding past medical expenses.  Specifically, Kent reasons that NHC Healthcare admitted his need for continued medical treatment because Kent alleged he required additional treatment when he filed his initial compensation claim in January 2009.  Kent submits that this allegation was deemed admitted by NHC Healthcare when NHC Healthcare did not timely file its answer to Kent's claim.  Kent further contends that NHC Healthcare had both actual and constructive knowledge of his need for the medical treatment incurred.

A.    Standard of Review

Kent requests de novo review of Point Three under 287.495.1(1), alleging the Commission "acted without or in excess of its powers[.]"  Whether the Commission acted within its statutorily-authorized powers is a question of law that we review de novo.  Davidson v. Davidson Masonry & Constr., LLC, 583 S.W.3d 517, 519 (Mo. App. W.D. 2019) (citing Treasurer of State-Custodian of Second Injury Fund v. Witte, 414 S.W.3d 455, 460 (Mo. banc 2013)).  While we review de novo the Commission's authority to render its decision, we apply the standards appropriate for determining whether the Commission's findings were supported by

19

sufficient competent evidence under the appropriate subsection of Section 287.495.1 as denoted in Point Two. See id.; Section 287.495.1(1), (4).

B.    Analysis

Section 287.140.1 provides that an "employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance, and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury." Generally, the employer has the right to choose the health care providers that will treat the employee. Section 287.140.10. However, "[i]f the employee desires, he shall have the right to select his own physician, surgeon, or other such requirement at his own expense." Section 287.140.1. "If the employee picks his own doctor, the employer must pay 'only when the employer has notice that the employee needs treatment, or a demand is made on the employer to furnish medical treatment, and the employer refuses or fails to provide the needed treatment.'" Customer Eng'g Servs. v. Odom, 573 S.W.3d 88, 92 (Mo. App. S.D. 2019) (quoting Poole v. City of St. Louis, 328 S.W.3d 277, 291 (Mo. App. E.D. 2010)) (additional citation omitted).

With regard to an employer's liability for payment of an employee's medical bills in connection with a worker's compensation claim, the claimant bears the burden to show that the employer had notice of the need for treatment or a demand of treatment, yet refused or failed to provide the needed treatment. See Vaught v. Vaughts, Inc./S. Mo. Const., 938 S.W.2d 931, 945 (Mo. App. S.D. 1997) (providing the burden was on a claimant to show that the respondents were aware of the claimant's need for home nursing care in order to recover past medical expenses), *overruled on other grounds by* Hampton, 121 S.W.3d 220; see also T.H. v. Sonic Drive In of High Ridge, 388 S.W.3d 585, 590 (Mo. App. E.D. 2012) ("A claimant in a worker's compensation proceeding has the burden of proving all essential elements of [their] claim.").

20

ALJs and the Commission are required to "weigh the evidence impartially without giving the benefit of the doubt to any party when weighing evidence and resolving factual conflicts." Section 287.800.

Consistent with the finding of the Commission, the parties agree that the record lacks evidence that Kent ever made a demand on NHC Healthcare for medical treatment following his return to work in March 2009. Moreover, the record contains no specific evidence that would have put NHC Healthcare on notice that Kent needed further medical care following his return to work in March 2009. Kent counters this substantive evidentiary deficiency by directing our attention to a conclusory claim contained in his January 2009 pleading for compensation that he "is in need of . . . additional medical treatment." Kent reasons that NHC Healthcare admitted his need for additional medical care when NHC Healthcare did not timely file an answer to Kent's claim. See Anderson v. Veracity Research Co., 299 S.W.3d 720, 728 (Mo. App. W.D. 2009) (internal citations omitted) (noting that untimely answers result in the admission of factual allegations, but not legal conclusions, in a claim for compensation). Critically, Kent provides no judicial authority supporting the constructive notice theory advanced by him and adopted by the ALJ. Even if NHC Healthcare's untimely answer allowed the Commission to treat Kent's January 2009 allegations for additional medical care as admitted, the record nevertheless requires us to affirm the Commission's denial of Kent's post-March 2009 medical expenses.

When an injured employee seeks medical care arising from a work injury at his own direction and with his own choice of provider, rather than the employer choosing the employee's course of treatment, two possible scenarios may have occurred: (1) the employee made a demand of the employer or otherwise put the employer on notice for the employee's need of medical care and the employer refused or failed to provide the needed medical treatment, or (2) the employee

21

elected to dictate his own course of treatment at his own expense. See Section 287.140.1; Customer Eng'g Servs., 573 S.W.3d at 92. Here, Kent argues and the ALJ agreed that NHC Healthcare had constructive notice of Kent's continuing medical care and treatment, thereby making NHC Healthcare liable for Kent's medical expenses despite the absence of any evidence showing Kent made a demand on NHC Healthcare for additional treatment and the affirmative evidence in the record that Kent elected to dictate his own course of treatment at his own expense. The fact that the ALJ may have agreed with a theory of constructive notice is outside the scope of this appeal, as we review the record independent of the ALJ's findings. See Schlereth, 589 S.W.3d at 651. We first note that Kent bears the fundamental burden of proving **each** element of his claim for compensation. See T.H., 388 S.W.3d at 590. Included in Kent's burden is proving that either he made a demand or gave notice to NHC Healthcare for continuing medical care due to his workplace injury and that NHC Healthcare subsequently failed to provide medical treatment. See id.; Vaught, 938 S.W.2d at 945. The Commission found that Kent failed to satisfy that burden of proof, but instead chose to pursue his own course of medical treatment at his own expense. We find the Commission's decision supported by sufficient competent evidence in the record. See Section 287.140.1; Customer Eng'g Servs., 573 S.W.3d at 92; T.H., 388 S.W.3d at 590; Vaught, 938 S.W.2d at 945. Indeed, where the record supports the possibility that the employee simply elected to direct their own medical treatment, as it does here, the Commission properly denies an award of past medical expenses. See Hawkins v. Emerson Elec. Co., 676 S.W.2d 872, 880 (Mo. App. S.D. 1984) (finding "[t]he Commission, on this evidence, could reasonably conclude that claimant chose to obtain treatment from physicians of her own choice, rather than accepting treatment from physicians selected by the employer,"

22

and holding as a result that "there was sufficient competent evidence to support the Commission's ruling that the employer is not responsible for claimant's medical expenses").

We agree that sufficient competent evidence supports the Commission's finding that Kent failed to sustain his burden with regard to past medical expenses. See id. The record shows that when Kent reported his workplace injury, NHC Healthcare immediately directed Kent's medical care and treatment through Dr. Randolph. Dr. Randolph concluded that Kent reached MMI in March 2009 and directed Kent to return to work with restrictions. Kent returned to work for NHC Healthcare with restrictions. When Kent returned to work, he was not receiving any medical care or treatment for his workplace injury. NHC Healthcare subsequently terminated Kent following several workplace infractions, including an issue involving a patient and improperly parking in the visitor's parking section.

Only after his termination by NHC Healthcare did Kent embark on a long, expensive, and at times questionable path seeking medical treatment for back pain Kent associates with his workplace injuries. Kent's journey involved multiple physicians and medical professionals offering varied diagnoses and treatments. The record *unambiguously* shows that at no time while Kent sought medical care and treatment from Dr. Parks or anyone else, did Kent make any demand on NHC Healthcare or notify NHC Healthcare of his desire to continue medical treatment with these professionals. To the contrary, the record clearly shows that Kent intentionally declined to notify NHC Healthcare of his intent to seek continuing medical care for his reported back pain following his termination of employment. The record supports the Commission's finding that Kent knowingly incurred medical care and treatment after his March 2009 termination at his own expense. See Section 287.140.1. The record reveals that Kent did not request any additional medical treatment from NHC Healthcare because he did not think

23

NHC Healthcare would assist him. Whether Kent was correct in his assessment of how NHC Healthcare might react to a post-termination request for medical care is strictly a matter of speculation and inconsequential to our review as the record before us clearly shows Kent never asked for medical treatment from NHC Healthcare after March 2009. Nevertheless, Kent argues the Commission is obligated to order NHC Healthcare to pay the medical expenses Kent incurred while directing his own course of treatment because NHC Healthcare had notice of his need for additional treatment. We are not persuaded. In the absence of any evidence that Kent ever made demand for medical treatment on NHC Healthcare, the Commission reasonably could have concluded—consistent with Kent's burden and our own precedential authorities—that Kent elected to guide his own treatment at his own expense. See id.; T.H., 388 S.W.3d at 590; Vaught, 938 S.W.2d at 945. Accordingly, NHC Healthcare would not be liable for the costs of Kent's medical care arising from that decision. See Section 287.140.1; T.H., 388 S.W.3d at 590; Vaught, 938 S.W.2d at 945.

The Commission did not act without or in excess of its powers by declining to award Kent past medical expenses, and the Commission's decision was supported by sufficient competent evidence. See Section 287.495.1(1), (4); Davidson, 583 S.W.3d at 519 (citing Witte, 414 S.W.3d at 460). Point Three is denied.

## IV.   Point Four—The Commission Did Not Err in Denying an Award of Additional TTD Benefits

In his fourth point on appeal, Kent contends the Commission erred in denying additional TTD benefits because the evidence showed Kent was totally disabled during the time period at issue. In particular, Kent argues that his own self-report of TTD was sufficient to support the Commission's grant of a TTD award.

24

A.      Standard of Review

In this point on appeal, Kent does not distinguish whether the Commission's denial of TTD was not supported by the Commission's own findings of fact or whether there is insufficient competent evidence in the record to warrant the Commission's denial of TTD. See Section 287.495.1(3), (4); Annayeva, 597 S.W.3d at 198. We proceed in our analysis bearing in mind both standards for error and under the overarching guideline that the Commission's findings of fact are conclusive and that we defer to the Commission's assessment of credibility of witnesses and the weight given to conflicting evidence. Annayeva, 597 S.W.3d at 198 (citing Section 287.495.1; Greer, 475 S.W.3d at 664).

B.      Analysis

"The purpose of a [TTD] award is to cover the employee's healing period." Stevens v. Citizens Mem'l Healthcare Found., 244 S.W.3d 234, 238 (Mo. App. S.D. 2008) (internal citation omitted). An award of TTD ceases to be appropriate when the employee is either able to work again or has reached MMI. Id. (internal citation omitted).

The Commission denied an award of TTD because any such award would be largely based on Kent's own self report, which the Commission found not to be credible. On appeal, Kent maintains that he "is capable of forming an opinion as to whether [he] is able to work, and [his] testimony alone is sufficient evidence on which to base an award of temporary total disability."[3] See id. (internal quotation omitted). We agree that an employee's self-assessment may be sufficient evidence to establish TTD. See id. But it does not follow that Kent's self-assessment is *conclusive as to a determination of disability*. As with any factual finding, we

---

[3] To the minimal extent that Kent argues the Commission's award of no TTD was contrary to its own findings, we observe that Kent repeats his error of resting his argument on findings made by the ALJ while ignoring the fact that the Commission expressly did not adopt the findings of the ALJ to the extent they were inconsistent with those of the Commission.

defer to the Commission's judgment as to the employee's credibility. See id.; Annayeva, 597 S.W.3d at 198 (citing Section 287.495.1; Greer, 475 S.W.3d at 664). The record before us plainly shows that not only did the Commission express concern as to Kent's credibility, but the Commission also considered evidence showing that no treating physicians had placed permanent restrictions on Kent's ability to work during the relevant period and that Kent had worked in at least some capacity for someone other than NHC Healthcare during the time in question. The Commission noted that Kent had been released to work by Dr. Randolph and that Dr. Randolph opined Kent's continued complaints following his return to work were not objectively supported. Finally, we observe that the Commission did not find Kent never suffered from TTD, but that Kent was totally disabled only during the period between his injury and his release to work, a period for which NHC Healthcare had already compensated Kent, consistent with the purpose of TTD awards to cover an employee's healing period. See Stevens, 244 S.W.3d at 238.

Deferring to the Commission's credibility determinations, we hold the denial of additional TTD benefits was not contrary to the Commission's findings of fact and was supported by sufficient competent evidence. See Annayeva, 597 S.W.3d at 198 (citing Section 287.495.1(3), (4); Greer, 475 S.W.3d at 664). Point Four is denied.

## V.     Points Five and Six—The Alleged Errors Concerning the Crane, Morris, and Parks Reports Are Not Preserved

In Points Five and Six, Kent alleges the Commission erred in excluding the Crane Report and in finding the Morris and Parks Reports had not been admitted into the record. We first address the argument raised by both NHC Healthcare and the Fund that Points Five and Six are not preserved for our review.

The record shows that the evidentiary rulings asserted as error in Points Five and Six were made by the ALJ, and not the Commission. Determinative of these two points on appeal,

26

we find nothing in the record to suggest that Kent raised the ALJ's alleged evidentiary errors before the Commission. "An issue appropriate for, but not addressed with the [C]ommission, cannot be litigated on appeal." St. John's Mercy Health Sys. v. Div. of Emp't Sec., 273 S.W.3d 510, 516 (Mo. banc 2009) (internal citation omitted).

It is understandable, given the favorable nature of the ALJ's award to Kent, that Kent chose not to pursue the ALJ's alleged evidentiary errors before the Commission. Nevertheless, Kent could have challenged the alleged erroneous rulings to sustain the final award in his favor even in the absence of a cross-appeal. See Treasurer of State - Custodian of Second Injury Fund v. Mickelberry, 606 S.W.3d 150, 158 (Mo. App. W.D. 2020) (quoting Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kansas City, 543 S.W.3d 28, 42 n.11 (Mo. banc 2018) ("A respondent on appeal may attack erroneous rulings of the trial court in order to sustain a judgment in his favor without filing a cross-appeal.")). Ultimately, "[t]here can be no excuse for failure to . . . preserve [basic issues] prior to appeal in the [C]ourt of [A]ppeals." St. John's Mercy Health Sys., 273 S.W.3d at 516. Accordingly, we must decline to review Points Five and Six. See id. Points Five and Six are denied.

### Conclusion

The final award of the Commission is affirmed.

_____
KURT S. ODENWALD, Judge

Angela T. Quigless, P.J., concurs.
James M. Dowd, J., concurs.

27